DUANE MORRIS LLP
Karineh Khachatourian (CA SBN 202634)
kkhachatourian@duanemorris.com
Patrick S. Salceda (CA SBN 247978)
psalceda@duanemorris.com
David T. Xue, Ph.D. (CA SBN 256668)
dtxue@duanemorris.com
2745 Hanover Street
Palo Alto, CA 94304-1194
Telephone: 650.847.4150
Facsimile: 650.847.4151

Attorneys for Plaintiff
NETAPP, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| NETAPP, INC., | Case No. 5:13-cv-05058-LHK |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT FOR VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030); TRESPASS TO CHATTEL; TRADE SECRET MISAPPROPRIATION; BREACH OF CONTRACT; INTENTIONAL INTERFERENCE WITH CONTRACT AND CONTRACTUAL RELATIONS; UNFAIR COMPETITION** |
| NIMBLE STORAGE, INC., MICHAEL REYNOLDS, an individual, DANIEL WEBER, an individual, SANDHYA KLUTE, an individual, TIMOTHY BINNING, an individual, NEIL GLICK, an individual, CHRISTOPHER ALDUINO, an individual, and Does 1-50 | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff NetApp, Inc. ("NetApp" or "Plaintiff"), by its attorneys, alleges as follows:

**NATURE OF THE ACTION**

1.     Defendant Nimble Storage, Inc. ("Nimble") is a company built on NetApp's innovation.  Nimble has engaged in unlawful hiring and business practices in order to rapidly bring to market products that it could not have created but for its reliance on NetApp.

2.     Throughout its existence, Nimble has targeted and encouraged NetApp employees to join the company and to take NetApp confidential information with them in violation of their contractual obligations.  Some former NetApp employees did just that, and Nimble is using that illegally-acquired information to compete unfairly against NetApp in the marketplace.  Upon information and belief, Nimble also has directed former NetApp employees, prior to them leaving NetApp, to delete and/or render unrecoverable, inaccessible, or unavailable NetApp information stored on their workstations to further frustrate NetApp's ability to compete in the marketplace.

3.     NetApp attempted to resolve this dispute with Nimble before filing suit, but all efforts at resolution failed.  NetApp now brings this action for injunctive relief and damages against Nimble, Michael Reynolds, Daniel Weber, Sandhya Klute, Timothy Binning, Neil Glick, and Christopher Alduino, for violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*, trespass to chattel, trade secret misappropriation, breach of contract, intentional interference with contract and contractual relations, and unfair competition.

**THE PARTIES**

4.     NetApp is a Delaware corporation with its principal place of business at 495 East Java Drive, Sunnyvale, California 94089.

5.     Nimble is a Delaware corporation with its principal place of business at 2740 Zanker Road, Suite 200, San Jose, California 95134.

6.     Upon information and belief, Defendant Michael Reynolds ("Reynolds") is a citizen of Australia, and resides in Melbourne, Australia.  Upon further information and belief, Reynolds is a Systems Engineer with Nimble Storage Australia Pty Limited ("Nimble AUS"), the Australian proprietary company controlled by Nimble pursuant to Australia Corporations Act 2001, § 50AA.

7.     Upon information and belief, Daniel Weber ("Weber") resides in Lakeside Park,

Kentucky.  Weber, a former NetApp employee, is bound by the confidentiality provision and post-employment restrictions in his employment agreement with NetApp, which is expressly governed by California law.  Upon information and belief, Weber is a Senior Account Executive at Nimble, a role with responsibilities similar to those he performed at NetApp.

8.     Upon information and belief, Sandhya Klute ("Klute") is a resident of Santa Clara County, California.  Klute, a former NetApp employee, is bound by the confidentiality provision and post-employment restrictions in her employment agreement with NetApp.  Upon information and belief, Klute is a Senior Engineering Program Manager at Nimble, a role with responsibilities similar to those she performed at NetApp.

9.     Upon information and belief, Timothy Binning ("Binning") resides in Cincinnati, Ohio.  Binning, a former NetApp employee, is bound by the confidentiality provision and post-employment restrictions in his employment agreement with NetApp.  Upon information and belief, Binning is a Senior Systems Engineer at Nimble, a role with responsibilities similar to those he performed at NetApp.

10.     Upon information and belief, Neil Glick ("Glick") is a resident of Santa Clara County, California.   Glick, a former NetApp employee, is bound by the confidentiality provision and post-employment restrictions in his employment agreement with NetApp.  Upon information and belief, Glick is a Technical Marketing Engineer at Nimble, a role with responsibilities similar to those he performed at NetApp.

11.     Upon information and belief, Christopher Alduino ("Alduino") is a resident of Raleigh, North Carolina.  Alduino, a former NetApp employee, is bound by the confidentiality provision and post-employment restrictions in his employment agreement with NetApp.  Alduino's title at Nimble is unknown, but is believed to be a role with responsibilities similar to those he performed at NetApp.

12.     NetApp is unaware of the true names and capacities of Does 1 through 50, inclusive, whether individual, partnership, corporation, unincorporated association, or otherwise, and therefore sues these defendants under such fictitious names.  NetApp will amend its Complaint to allege their true names and capacities when ascertained.

13.     Upon information and belief, at all times herein mentioned, each Defendant acted individually and/or as the agent, co-conspirator, aider, abettor, joint venturer, alter ego, third-party beneficiary, employee, officer, director, or representative of Nimble and, in doing the things hereinafter averred, acted within the course and scope of such agency, employment or conspiracy and with the consent, permission, and authorization of Nimble.  Upon information and belief, all actions of each Defendant as averred in the claims for relief stated herein were ratified and approved by Nimble, or its officers, directors, or managing agents.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq*.

15.     This Court has personal jurisdiction over Nimble because it maintains its principal place of business within the Northern District of California and because it harmed NetApp in this district by seeking a competitive advantage through among other things: (1) wrongful use of NetApp's confidential and proprietary information obtained by its employees formerly employed by NetApp and (2) upon information and belief, directing former NetApp employees to take, delete and/or withhold NetApp's confidential and proprietary information, to the detriment of NetApp and for the benefit of Nimble.  The acts by the individual defendants as alleged herein were directed by Nimble such that it could reap the benefits of innovation created and fostered by NetApp over decades at great expense.

16.     This Court has personal jurisdiction over Reynolds because he intentionally accessed, without authorization and/or exceeding authorization, NetApp's protected computer, which he was advised resides in the forum state (California), and which he knew would cause (and did cause) harm to NetApp, a resident of California.  Reynolds' initial access to NetApp's protected computer was administered by NetApp in California via a username and password pair.  Reynolds also registered on NetApp's Support Portal to gain access to NetApp training courses, as well as other resources, software, and materials with notice that these items are connected to California.  For example, Reynolds also agreed to the terms of the NetApp data protection authorization policy, during the Support Portal registration process, which states clearly that the NetApp global system

database – on which his and other users' personal data resides – is located in Sunnyvale, California, U.S.A.  Further, the user manual for the Synergy database, one of the databases which Reynolds improperly accessed, denotes that it was prepared by NetApp in Sunnyvale, California and contains confidential and proprietary information belonging to NetApp.  Moreover, on information and belief, Reynolds has attended meetings at Nimble headquarters in San Jose, California, in person, via videoconference, by telephone, or other electronic or virtual means, and communicates with Nimble personnel located in San Jose, California via telephone, fax, email and mail.  On further information and belief Reynolds communicated with Nimble headquarters in San Jose, California during his hiring process.  And further still, the End User License Agreement ("EULA") between Reynolds and NetApp, which is one basis for NetApp's breach of contract claim against Reynolds, is deemed to have been made in and is construed pursuant to the laws of the State of California. Accordingly, Reynolds has purposefully directed his activities to the State of California and/or purposefully availed himself of this jurisdiction.

17.     This Court has personal jurisdiction over Weber because he: (a) is bound by his NetApp employment agreement, which he agreed would be governed by California law; (b) transacted business and contracted with his former employer, NetApp, in California on matters directly related to the current dispute; (c) has visited NetApp customers in California; and (d) is causing injury to NetApp in California.  Upon information and belief, Weber has attended meetings at Nimble headquarters in San Jose, California, in person, via videoconference, telephone or other electronic or virtual means, and communicates frequently with Nimble personnel located in San Jose, California via telephone, fax, email and mail.

18.     This Court has personal jurisdiction over Klute because she: (a) is bound by her NetApp employment agreement, which she agreed would be governed by California law; (b) is a resident of Santa Clara County; (c) transacted business and contracted with her former employer, NetApp, in California on matters directly related to the current dispute; (d) conducts business in California on behalf of her current employer; and (e) is causing injury to NetApp in California.

19.     This Court has personal jurisdiction over Binning because he: (a) is bound by his NetApp employment agreement, which he agreed would be governed by California law; (b)

transacted business and contracted with his former employer, NetApp, in California on matters directly related to the current dispute; (c) has visited NetApp customers in California; and (d) is causing injury to NetApp in California.  Upon information and belief, Binning has attended meetings at Nimble headquarters in San Jose, California, in person, via videoconference, telephone or other electronic or virtual means, and communicates frequently with Nimble personnel located in San Jose, California via telephone, fax, email and mail.

20.     This Court has personal jurisdiction over Glick because he: (a) is bound by his NetApp employment agreement, which he agreed would be governed by California law; (b) is a resident of Santa Clara County; (c) transacted business and contracted with his former employer, NetApp, in California on matters directly related to the current dispute; (d) conducts business in California on behalf of his current employer; and (e) is causing injury to NetApp in California.

21.     This Court has personal jurisdiction over Alduino because he: (a) is bound by his NetApp employment agreement, which he agreed would be governed by California law; (b) transacted business and contracted with his former employer, NetApp, in California on matters directly related to the current dispute; and (c) is causing injury to NetApp in California.  Upon information and belief, Alduino has attended meetings at Nimble headquarters in San Jose, California, in person, via videoconference, telephone or other electronic or virtual means, and communicates frequently with Nimble personnel located in San Jose, California via telephone, fax, email and mail.

22.     This Court has supplemental jurisdiction over NetApp's state law claims because it has original jurisdiction over NetApp's Computer Fraud and Abuse Act claim against Reynolds and Nimble,  and those state law claims involve: (1) Nimble, the employer common to all defendants; (2) interpretation of the terms of identical NetApp employment contracts,  the obligations arising therefrom, to be construed under California law; and (3) relate to a common scheme executed by Nimble and by the individual defendants to harm NetApp's business interests.

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, a substantial part of the events and omissions giving rise to the claims occurred here and because defendants are subject to personal jurisdiction in this district.

**INTRADISTRICT ASSIGNMENT**

24.     Division assignment to the San Jose Division of the United States District Court for the Northern District of California is proper pursuant to Civil Local Rule 3-2(e) because a substantial part of the events giving rise to the claims occurred in Santa Clara County, California.

**FACTUAL ALLEGATIONS**

**A.     Through Work and Investment, NetApp Becomes an Innovator and Market Leader**

25.     Founded in 1992, NetApp is a Fortune 500 storage and data management solutions provider with a focus on continued innovation to meet its customers' evolving business needs.  The company shares a vision of being a model company where it delivers the best possible results for the communities it serves by living a set of core values that includes winning in the marketplace with integrity and honor.  NetApp believes that a great culture is the foundation for such success, and it practices what it preaches.  NetApp consistently is recognized by the Great Place to Work Institute, *Fortune* magazine and other local publications as a great place to work in countries and cities around the world.  In 2012, NetApp ranked among the top 10 Great Places to Work in all 20 of the locations around the world where it participated in Best Workplace rankings and currently is ranked 6th in the United States.  In October 2013, NetApp was recognized by the Great Place to Work Institute as the #3 "World's Best Multinational Workplace."

26.     Over the past 21 years, there has been a massive explosion in the use and retention of electronic data as a result of many factors including the rise of the Internet, e-commerce, online banking, electronic mail, the migration from largely paper record keeping to nearly exclusive electronic record retention, enterprise-level desktop virtualization, and the cloud, to name a few.  Throughout this time, NetApp has continued to enable customers to store, manage, and protect their electronic data with a wide variety of innovative products, technologies, and solutions that have helped transform the data storage industry.

27.     In addition to the factors noted above, the increased usage of email and database systems for real-time e-commerce applications has created significant strain on organizations' ability to effectively and efficiently store and manage their electronic data.  Both types of applications dramatically increased the amount of data records that organizations must retain for each employee

and/or customer.

28.     NetApp has delivered key innovations during this period that enable organizations to more efficiently address their burgeoning storage requirements without sacrificing data integrity or security.  To remain a leader in the industry it helped create, NetApp devotes tremendous resources to the development of new technologies and processes.  In 2012 alone, NetApp's research and development expenditures exceeded $900 million.  NetApp also has been widely acclaimed for its spirit of innovation, including recognition from *Forbes* as one of the "World's Most Innovative Companies," by *Intellectual Property Owners Association* as a "Top 300" United States patent holder, and by *IEEE Spectrum* as the best "Quality Over Quantity" patent portfolio in its industry.

29.     NetApp's research and development investments are of paramount importance because the markets in which it competes are subject to rapid technological change, evolving standards, changes in customer requirements, and new product introductions and enhancements.  As a result, NetApp's success depends in significant part upon its ability, on a cost-effective and timely basis, to continue to enhance its existing products, develop and introduce new products that improve performance and functionality, reduce total cost of ownership, and deliver high quality products and services.

30.     Given the competitive world of high technology, where innovation is the bedrock of success, NetApp's confidential and proprietary information is among its most valuable assets because it allows the company to provide sophisticated software and hardware products and services to satisfy the high standards of performance and reliability required by its customers.  If NetApp's proprietary and confidential information is misused, a competitor may gain an unfair advantage even though it did not invest the time, money and/or other resources that NetApp did to develop such products, services and technologies.  To prevent against such wrongdoing, NetApp protects its proprietary and confidential information with various data-protection techniques including secure logins and passwords.

**B.**     **Nimble Raids NetApp By Recruiting Its Employees and Obtaining NetApp Confidential Information To Compete Unfairly In the Marketplace**

31.     NetApp and Nimble are direct competitors in the highly competitive data storage

1  industry.  Unlike other startup companies, which often launch an initial product and subsequently

2  evolve it based on customer feedback, Nimble has achieved rapid growth and customer adoption

3  because, in the words of its CEO Suresh Vasudevan ("Vasudevan"), a former NetApp executive,

4  Nimble "quickly established parity on a range of features that are typically only to be found in

5  mature products that have been around for a decade or so."  This feat was not accomplished by

6  starting from scratch.  Rather, Nimble needed to rely heavily on foundational information as to the

7  internal working of NetApp's products and its proprietary business processes.  Nimble obtained this

8  information and know-how by directly targeting NetApp employees and NetApp resellers and

9  encouraging them to bring NetApp's proprietary information and other NetApp property with them

10  such that Nimble could rapidly bring to market storage systems to compete with NetApp.

11          32.    Vasudevan also has been quoted as saying that "In just two and a half years of

12  shipping product, we have an installed base of over 1,100 customers and over 2,000 deployments."

13  Nimble could not have developed its business so rapidly but for its improper and illegal use of

14  NetApp innovation.  NetApp's products are the result of decades of hard work, including billions of

15  dollars in research and development expenditures.

16          33.    Nimble has identified hiring and expanding its sales force as key factors in its ability

17  to be successful.  Nimble acknowledged in its recent Form S-1 filing with the United States

18  Securities and Exchange Commission ("S-1") that hiring in the San Francisco Bay area is

19  competitive and that it has experienced difficulty in hiring and retaining highly skilled employees

20  with appropriate qualifications in the past.

21          34.    Nimble further states in its S-1 that a principal competitive factor in the intensely

22  competitive data storage industry characterized by constant change and innovation is larger, more

23  mature intellectual property portfolios.

24          35.    Nimble similarly acknowledges in its S-1 that continued investment in research and

25  development and intellectual property is critical to its business.  According to Nimble, in the years

26  ending January 31, 2011, 2012 and 2013 and the six months ending July 31, 2013, Nimble has spent

27  $4.4 million, $7.9 million, $16.1 million and $14.4 million, respectively, on research and

28  development.

36.     To address these problems and gain parity with its major competitor in a highly competitive industry, Nimble targeted NetApp talent and proprietary and confidential information to compete unfairly in the marketplace.  Specifically, Nimble engaged in a scheme whereby it targeted and hired former NetApp employees who possess and have access to valuable, proprietary and/or confidential NetApp business and technical information.  In fact, Nimble is the primary employer of each of the individual defendants named in this suit.  Upon information and belief, Nimble further attempted to inhibit the growth and progress of NetApp by encouraging those departing from NetApp to Nimble to delete, and/or make otherwise unrecoverable, inaccessible, or unavailable NetApp's confidential and proprietary information to deprive NetApp of its employee work product.

37.     According to *Forbes* magazine, when Vasudevan came to Nimble in January 2011, Nimble had 40 employees.  Within a year of his arrival, Nimble experienced massive growth to 230 employees.  Currently, approximately 15% of Nimble's total workforce is made up of former NetApp employees, including half of its executive staff.  Between July 2012 to July 2013 alone, Nimble hired approximately 55 NetApp employees, with a focus on those who had technical and sales roles at NetApp – persons who had access to NetApp technical and sales documents that could help Nimble quickly develop a competing product to unfairly compete with NetApp.

38.     Upon information and belief, Nimble regularly trades on NetApp's name by telling customers and/or prospective customers that Nimble has acquired technology teams from NetApp, many of which were employed by NetApp for a long time, implying that Nimble's products provide quality and functionality synonymous with NetApp.

## C.     Reynolds Accesses NetApp's Protected Computer Systems Without Authorization

39.     Upon information and belief, between October 2011 and April 2013, Reynolds was employed by Thomas Duryea Consulting ("TDC"), an Australian IT infrastructure consultancy business with offices in Melbourne and Sydney, Australia.

40.     On or about September 29, 2008, NetApp Australia Pty Limited, the Australian entity which NetApp controls, entered into a Reseller Authorization Agreement with TDC which provides, among other things, that the parties and their employees agree to hold the proprietary or confidential information of the other party in strict confidence; will not copy, reproduce, or otherwise use such

information for any purpose other than the provision of services under the agreement; and will protect the other party's protected non-public information, including any intellectual property. These restrictions and prohibitions on the use of proprietary or confidential information were in place during the entirety of Reynolds' employment with TDC and remain in effect today.

41.    NetApp grants or limits access to the protected systems, networks of computers and data storage devices which contain proprietary and confidential information through the use of username and password pairs granted to NetApp employees and resellers for the purpose of selling NetApp products.  Reynolds was provided access to NetApp's protected computers as a result of his employment with TDC.  The username and password and other security measures implemented for these protected computers is administered in California.

42.    Reynolds took and completed a series of training courses offered by NetApp that are available to NetApp employees and approved resellers, including web based, virtual live web casts, and in person courses such as NetApp's Accredited Storage Architect  Program ("ASAP.")  Many of those courses, training materials, and administration thereof are maintained in Sunnyvale, California.

43.    Reynolds also had access to NetApp's Support Portal, which contains NetApp software and firmware downloads, product documentation, training course information, and other additional resources.

44.    In order to resell NetApp products and services while at TDC, Reynolds had access to NetApp's Field Portal and TechNet sites, Synergy database, Support Portal, and System Performance Modeler Application database ("SPM"), which are for NetApp partners and employees, require a user log in and password, and contain NetApp confidential and proprietary information.

45.    Many of the materials provided to Reynolds during his training with NetApp – as well as the resources provided to Reynolds on the NetApp Support Portal, Field Portal, TechNet site, Synergy database, and SPM database – identify NetApp as a California corporation, with its headquarters located in Sunnyvale.  The materials also explain that NetApp's databases are located in California and that the information contained therein is confidential and proprietary to NetApp.

46.    Upon information and belief, Reynolds also was advised by TDC and/or otherwise made aware of his obligation to hold NetApp's proprietary and/or confidential information in strict

confidence, and not to copy, reproduce, transfer or otherwise disclose such information to third parties or to use such information for any purpose whatsoever other than the provision of services for NetApp.

47.     Following Reynolds' departure from TDC in April 2013, Reynolds was not authorized to access, copy, or download NetApp's computerized data.  When he began working for Nimble, Reynolds knew or should have known that his access was unauthorized because he was no longer reselling NetApp products and services. To the contrary, at the time he wrongfully accessed NetApp's data, Reynolds was working for a direct competitor (Nimble) and competing against NetApp.

**D.     Reynolds and Nimble Surreptitiously Obtain NetApp's Confidential and Proprietary Information**

48.     On or about May 2013, Reynolds began employment with Nimble Storage Australia Pty Limited ("Nimble AUS").  On information and belief, Nimble AUS is a small Australian proprietary entity controlled by Nimble Storage, Inc. under the Australia Corporations Act 2001, § 50AA.  Nimble AUS's regulatory filings declare that it is 100% owned by Nimble Storage, Inc., which it identifies as its "Ultimate Holding Company."  Further, Nimble Storage, Inc. is identified as the sole member of Nimble AUS, and Vasudevan, Anup Singh (Nimble's Chief Financial Officer) and David Chung (Nimble's VP Corporate Controller), all executives of Nimble Storage Inc., are listed as directors of Nimble AUS.  Nimble's own regulatory filings in the United States refer to Nimble's Australia operations as a "sales office," and Nimble boasts in press releases that it has "employees" in Australia.  Further still, Nimble handles the recruitment and hiring of employees for Nimble AUS out of San Jose, California.  Chris Wade, a former NetApp employee, is listed as the contact person for job postings currently listed for positions in Australia.  Chris Wade works out of Nimble's headquarters, in San Jose, California.

49.     After beginning his employment with Nimble AUS, Reynolds accessed NetApp's protected computers on a variety of occasions from June 3, 2013 through August 2013, including but not limited to the following:

- Accessed NetApp's Synergy database on six (6) occasions on or about June 4,

-11-

2013;

- Accessed NetApp's System Performance Modeler Application database once on or about July 25, 2013 and on three (3) occasions on or about August 14, 2013;

- Accessed NetApp's Support Portal on seven (7) separate occasions between June 3, 2013 and August 14, 2013;

- Accessed the Field Portal on three (3) separate occasions between June 2, 2013 and July 18, 2013; and

- Accessed the TechNet Site on four (4) separate occasions between July 24, 2013 and August 14, 2013.

50.     NetApp's Synergy database, System Performance Modeler Application database, Field Portal, TechNet Site, and Support Portal all require log-in credentials because they contain confidential and proprietary information including but not limited to, NetApp's products and services and NetApp's application framework that allows customers to build accurate, detailed models of NetApp products and services.  These systems derive independent value from the fact that they are available only to NetApp employees, partners and approved NetApp resellers selling products on behalf of NetApp.  Such systems – and the information contained therein – are a product of significant research and development investment on the part of NetApp and an important competitive advantage for NetApp.

51.     Access to and/or use of information obtained from NetApp's Synergy database is governed by an End User License Agreement ("EULA"), an advisory preceding the download of the Synergy software ("Legal Notice"), and a warning that the Synergy software is to be used only by NetApp employees and registered NetApp partners and that any use by other persons or parties is prohibited ("Download Warning").  Under the terms of the EULA, users agree that they will use the software solely as embedded in, and for execution on, NetApp equipment originally purchased from NetApp or its authorized resellers, and further agree to give NetApp the right to perform an audit of their books, records, systems and usage associated with the software to verify compliance with the EULA.  By installing and/or using the software, users indicate their acceptance of the EULA and all

terms stated therein.  Further, users are advised in the Download Warning that "USE OF THIS PRODUCT, INCLUDING THIS VERSION HISTORY, IS FOR NETAPP EMPLOYEES AND REGISTERED NETAPP PARTNERS.  USAGE BY ANY OTHER PERSONS OR PARTIES IS PROHIBITED."  In addition, the Synergy Legal Notice, which was acknowledged and agreed to by Reynolds, reads in pertinent part that the contents of the database are proprietary and unauthorized distribution may result in civil or criminal penalties.

52.     Upon information and belief, at the time Reynolds downloaded NetApp's Synergy Software, he was aware of the confidential and proprietary nature of the information he was accessing, and was aware of the terms of use.  And during each subsequent access to the Synergy database, Reynolds was advised that the material contained therein was NetApp confidential and propriety information. Reynolds, like other Synergy users, received system notifications and updates indicating that the messages were being sent from NetApp in Sunnyvale, California.  The Synergy user manual, which is available to all Synergy users, references NetApp in Sunnyvale, California.

53.     As a Nimble employee who was no longer employed by TDC, and thus no longer selling NetApp's products, Reynolds had no reason to access NetApp's restricted databases other than to use the confidential and proprietary information he obtained against NetApp – and for the benefit of Nimble– in the marketplace.

54.     Upon information and belief, Reynolds has used the confidential and proprietary information he wrongfully and illegally obtained from NetApp's protected databases while soliciting business on behalf of Nimble.

**E.     Weber Violates His Employment Agreement with NetApp**

55.     Weber worked at NetApp from approximately January 30, 2006 to February 8, 2013, as an Enterprise Account Manager.  As a long time senior employee of NetApp, Weber was in a position of trust and confidence and had access to NetApp proprietary and confidential information, such as information about NetApp customers, which would be very valuable to a competitor such as Nimble.

56.     As a NetApp employee, Weber signed a contract entitled "Proprietary Information and Inventions Agreement" (the "Agreement"), which remains in full force and effect.  The

Agreement defines and describes the following pertinent key terms:

- "Proprietary Information" is information that was or will be developed, created or discovered by or on behalf of [NetApp], or which became or will become known by, or was or is conveyed to [NetApp], which has commercial value in [NetApp]'s business.

- "Proprietary Information" includes, but is not limited to information about software programs and subroutines, source and object code, algorithms, trade secrets, designs, technology, know-how, processes, data, ideas, techniques, inventions (whether patentable or not), works of authorship, formulas, business and product development plans, customer lists, terms of compensation and performance levels of Company employees, [NetApp] customers and other information concerning [NetApp]'s actual or anticipated business, research or development, or which is received in confidence by or for [NetApp] from any other person.

- "Company Documents and Materials" are documents or other media or tangible items that contain or embody Proprietary Information or any other information concerning the business, operations or plans of [NetApp], whether such documents, media or items have been prepared by me or by others.

- During the term of my employment and for one (1) year thereafter, I will not encourage or solicit any employee of the Company to leave the Company for any reason or to accept employment with any other company. As part of this restriction, I will not interview or provide any input to any third party regarding any such person during the period in question.

57.    As a condition of his employment, Weber agreed to (1) keep NetApp Proprietary Information confidential; (2) leave NetApp Company Documents and Materials at the company upon his departure; and (3) not encourage any NetApp employees to leave NetApp during the term of his employment and for one year thereafter. Weber has breached the Agreement in several ways.

58.    In early 2013 – while Weber was still employed by NetApp – Weber spoke to another NetApp employee, Timothy Binning ("Binning"), regarding possible employment at Nimble. In an obvious effort to avoid detection by NetApp, Weber communicated with Binning via Yahoo! Instant Message ("IM"), rather than via NetApp's corporate e-mail system. In fact, Weber and Binning even lamented having to "mov[e] to IM for "secu[r]ity/confidential"..lol [("Laughing Out Loud")]." In one such IM chat dated January 18, 2013, Weber discussed recruiting Binning, as well as other then-current NetApp employees, to join him at Nimble. Later, on February 5, 2013, Weber told Binning, again via IM, that he had received an offer from Nimble and that Binning would be

-14-

1    receiving one as well based in large part on Weber's recommendation.

2         59.    Upon information and belief, Weber did not accept his offer with Nimble until he had

3    secured a position for Binning at Nimble as well.  On February 7, 2013, after Weber ensured that

4    Binning would accept a position at Nimble, both Weber and Binning resigned.

5         60.    Two days before he resigned from NetApp, Weber sought, purchased, and used an

6    external storage device specifically for the purpose of downloading NetApp Company Documents

7    and Materials and removing that information from NetApp's premises.  In a Yahoo! IM chat with

8    Binning that same day, Weber unabashedly declared that he "went with the seagate GoFlex

9    1TB..very small..fits in laptop bag..I can drag/drop while at QBR [("Quarterly Business Review")] if

10   needed...lol [("Laughing Out Loud")]...and later can share files between mac and pc..."  Minutes

11   later, Weber declared that he was "transferring data now."

12        61.    Similarly, in a chat dated February 5, 2013, Binning told Weber that he needed to

13   "get a USB Drive asap [as soon as possible]."  After the two discussed what information they would

14   tell NetApp upon resigning, Binning advised that he was "hitting the car…goign [sic] to get a usb

15   drive…so shutting down IM call me."  Approximately two hours later, Binning again chatted with

16   Weber and advised that "all email backed up … all files backed up … all web bookmarks backed

17   up … i'm set."  In response, Weber did not discourage or stop Binning from taking NetApp

18   Company Documents and Materials; rather, Weber revealed that he would be using a Seagate

19   GoFlex 1TB USB storage device to download his files from NetApp's systems.

20        62.    Categories of NetApp Company Documents and Materials Weber took from NetApp

21   include sales material; pricing models; sales strategies; and detailed customer information.  The

22   documents taken relate to, among other things, NetApp's FAS 2200 and 3200 series storage systems,

23   which compete directly with Nimble's CS series product line.  (The documents are referenced

24   collectively herein as the "Weber Documents".)

25        63.    Many of the documents taken by Weber constitute NetApp Company Documents and

26   Materials, contain information that is confidential, proprietary, competitively sensitive, owned by

27   NetApp, and expressly subject to the restrictions set forth in the Agreement.  Weber promised that he

28   would not remove any NetApp Company Documents and Materials except as required to do so in

-15-

connection with performing the duties of his employment.  Weber further agreed that, immediately upon termination from NetApp, he would return all Company Documents and Materials.

64.     Information contained in the Weber Documents derives independent economic value by virtue of not being generally known, particularly to NetApp's competitors, including Nimble, who could obtain substantial economic value from its disclosure or use, including by using the information to unfairly compete with NetApp in the marketplace.

65.     NetApp takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of its proprietary and confidential information.  Weber accessed and downloaded NetApp Company Documents and Materials a mere two days before he resigned and had no legitimate business reason for accessing the particular, highly confidential NetApp Company Documents and Materials he took from NetApp.

**F.     Klute Violates Her Contractual Obligations to NetApp**

66.     Klute worked at NetApp from approximately February 28, 2011 to June 19, 2013, as a Senior Engineering Program Manager.  As a NetApp employee, Klute, like Weber, signed a contract entitled "Proprietary Information and Inventions Agreement" (the "Agreement"), the terms of which are identical and which remain in full force and effect today.

67.     As a condition of her employment, Klute agreed to (1) keep NetApp Proprietary Information confidential; and (2) leave NetApp Company Documents and Materials at the company upon her departure.  Klute has breached the Agreement in several ways.

68.     Shortly before her departure from NetApp, Klute engaged in wholesale copying of data from her laptop to external storage devices.

69.     Upon information and belief, Klute verbally accepted an offer of employment with Nimble on or about June 11, 2013, after more than a two-month recruitment process.  Thereafter, on Sunday, June 16, 2013 Klute used at least one external storage device to download NetApp Company Documents and Materials.  Klute resigned a few days later on June 19, 2013, telling her manager only that she was going to work for a competitor.

70.     Among the documents Klute downloaded two days before she resigned from NetApp were internal proprietary and confidential NetApp documents that cover various important aspects of

NetApp's next generation AutoSupport service, an area where Nimble and NetApp compete. NetApp's AutoSupport service is a recognized innovation in the enterprise storage field. Customers increasingly require some form of remote maintenance application, and a competitor would gain a significant advantage by possessing NetApp's Company Documents and Materials on this and other key features.

71.     The documents taken by Klute, which constitute NetApp Company Documents and Materials, are expressly subject to the restrictions set forth in the Agreement. Klute, like Weber, agreed that she would not remove any Company Documents and Materials from NetApp, except as required to do so in connection with performing the duties of her employment. Klute further agreed that, immediately upon termination from NetApp, she would return all NetApp Company Documents and Materials.

72.     The information contained in many of the NetApp Company Documents taken by Klute is proprietary, confidential, competitively sensitive, and owned by NetApp. It derives independent economic value by virtue of not being generally known, particularly to NetApp's competitors, including Nimble, who could obtain substantial economic value from its disclosure or use, including by using the information to get to market faster.

73.     As explained above, NetApp takes, and at all relevant times has taken, reasonable steps to safeguard its proprietary and confidential information. Klute accessed and downloaded the NetApp Company Documents and Materials right before she was terminated and had no legitimate business reason for accessing the particular, highly confidential NetApp Company Documents and Materials she took from NetApp.

**G.     Binning Violates His Contractual Obligations to NetApp**

74.     Binning worked at NetApp as a Systems Engineer from approximately April 2004 to February 8, 2013. As a NetApp employee, Binning, like Weber and the other individual defendants (excluding Reynolds), signed a contract entitled "Proprietary Information and Inventions Agreement" (the "Agreement"), the terms of which are identical and which remain in full force and effect today. As a condition of his employment, Binning agreed to (1) keep NetApp Proprietary Information confidential; and (2) leave NetApp Company Documents and Materials at NetApp upon

-17-

his departure.

76.     Upon information and belief, and as noted above, Binning and Weber conspired to take, prior to their departure from NetApp, company property to use while at Nimble.  In a Yahoo! IM Chat dated February 1, 2013, Binning wrote to Weber "it will be FUN again to have something in my trunk that I can fire up and get dirty again. … instead of living [sic] behind a f*%king PPT [PowerPoint] deck saying…you should try it ... we could start a Nimble Users Group."  Then, in a Yahoo! Chat dated February 5, 2013, a mere four days before his departure, Binning told Weber that he had downloaded his email, files, web bookmarks and was "set" to give notice to NetApp that he was leaving the company.

77.     On December 13, 2013, NetApp wrote to Binning advising him of his obligation under the terms of the Agreement to return any NetApp property in his possession.  Thereafter, on December 17, 2013, Binning, through counsel, advised NetApp that "any and all NetApp information has been gathered and provided to counsel."  Binning has since refused to return the NetApp information in the possession of his counsel though requested by NetApp to do so.

**H.     Glick Violates His Contractual Obligations to NetApp**

78.     Upon information and belief, Glick worked at NetApp from February 5, 2007 until May 4, 2013 as a Technical Marketing Engineer.  Glick also signed a contract entitled "Proprietary Information and Inventions Agreement" (the "Agreement"), the terms of which are identical to those signed by Klute, Weber, and Binning.  The terms of the Agreement remain in full force and effect today.

79.     As a condition of his employment, Glick agreed, under the terms of the agreement to "immediately upon the termination of [his] employment … return all [NetApp] Company Documents and Materials."  Glick did not abide by his contractual obligations.

80.     On or about May 2, 2013, two days before his departure from NetApp, Glick took steps to delete and/or render unrecoverable, inaccessible, and/or unavailable NetApp Company Documents and Materials stored on his NetApp computer.  Upon information and belief, Glick took similar steps to render unrecoverable, inaccessible, and/or unavailable NetApp Company Documents and Materials stored on his second NetApp computer.  Glick performed these steps intentionally to

delete and/or make unrecoverable, inaccessible, and/or unavailable the NetApp Company Documents and Materials contained on his computers at that time, and/or hide the fact that he took NetApp Company Documents and Materials with him.

**I.     Alduino Violates His Contractual Obligations to NetApp**

81.     Upon information and belief, Alduino worked at NetApp from March 2006 until November 21, 2013 as a Senior SAN Switch Interoperability Engineer.  Alduino also signed a contract entitled "Proprietary Information and Inventions Agreement" (the "Agreement"), the terms of which are identical and which remain in full force and effect today.

82.     As a condition of his employment, Alduino agreed, under the terms of the Agreement, to "immediately upon the termination of [his] employment … return all [NetApp] Company Documents and Materials."  Alduino did not abide by his contractual obligations.  Instead, on the day before he departed NetApp, Alduino took steps to delete and/or render unrecoverable, inaccessible, and/or unavailable NetApp Company Documents and Materials stored on his NetApp computer.  Upon information and belief, Alduino performed these actions intentionally to delete and/or make unrecoverable, inaccessible, and/or unavailable  NetApp Company Documents and Materials contained on his NetApp computer at that time and/or hide the fact that he took NetApp Company Documents and Materials with him.

**FIRST CAUSE OF ACTION**
**Violations of Computer Fraud and Abuse Act**
**18 U.S.C. §§ 1030(a)(2)(C) & (a)(4) & (a)(5)**
**(Against Defendants Reynolds and Nimble)**

83.     NetApp incorporates by reference each of the allegations in the preceding paragraphs of this First Amended Complaint as if set forth fully herein.

84.     Upon information and belief, Reynolds and Nimble conspired to commit acts which constitute violations of the Computer Fraud and Abuse Act so that Nimble could obtain a competitive edge in the marketplace through wrongful use of NetApp's confidential and proprietary information.

85.     Nimble, with Reynolds acting as its agent in the course and scope of his employment and for the benefit of his employer Nimble, violated the Computer Fraud and Abuse Act, 18 U.S.C.

§ 1030(a)(2)(C), by intentionally accessing a computer used for interstate and foreign commerce or communication, without authorization or by exceeding authorized access to such a computer, and by obtaining information from such a protected computer.  As Reynolds' employer, Nimble is vicariously and jointly liable for the unlawful acts committed by Reynolds.

86.    Reynolds and Nimble violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4) by knowingly, and with intent to defraud NetApp, accessing a protected computer, without authorization or by exceeding authorized access to such a computer, and by means of such conduct furthered the intended fraud and obtained one or more things of value, including but not limited to NetApp's software, support materials and information about how NetApp products work.

87.    Reynolds and Nimble violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A) by knowingly causing the transmission of a program, information, code, or command and as a result intentionally causing damage without authorization to a protected computer owned by NetApp.

88.    Reynolds and Nimble violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(5)(B) & (C) by intentionally accessing a protected computer without authorization, causing damage to NetApp, recklessly or without due regard for their actions.

89.    Each of the computer system or systems that Reynolds and Nimble accessed as described above constitutes a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

90.    As a result of Reynolds' and Nimble's conduct, NetApp has suffered damage including, without limitation, harm to the integrity of its data, programs, and computer system as well as losses related to such items as investigation costs including attorneys' fees and internal NetApp time, in an amount to be proved at trial, but, in any event, in an amount well over $5,000.00, the minimum statutory amount, aggregated over a one-year period.

91.    Reynolds' and Nimble's unlawful access to and theft from NetApp's computers also has caused NetApp irreparable injury.  Unless restrained and enjoined, Nimble will continue to use the wrongfully and illegally obtained NetApp confidential and proprietary information against NetApp in the marketplace.  NetApp's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling NetApp to remedies including injunctive relief as provided

by 18 U.S.C. § 1030(g).

## SECOND CAUSE OF ACTION
### Trespass to Chattels
### (Against Defendants Nimble and Reynolds)

92.     NetApp incorporates by reference each of the allegations in the preceding paragraphs of this First Amended Complaint as if set forth fully herein.

93.     NetApp's password-protected computer systems are repositories of valuable proprietary information and are essential to NetApp's technical support services.

94.     Nimble, through Reynolds' access to and downloading from NetApp's protected computer systems, as described above, intentionally and without authorization interfered with NetApp's possessory interest in NetApp's computer systems.

95.     Reynolds bad acts were committed while within the scope of his employment.  As Reynold's employer, Nimble is vicariously and jointly liable for the unlawful acts committed by Reynolds.

96.     Reynolds and Nimble's unauthorized use proximately resulted in damage to NetApp.

97.     The loss includes, but is not limited to, the diminution of value of these proprietary resources.

98.     NetApp is entitled to compensatory damages, injunctive relief and such other relief as the Court may deem appropriate.

## THIRD CAUSE OF ACTION
### Trade Secret Misappropriation
### (Against Defendants Klute, Weber and Nimble)

99.     NetApp incorporates by reference each of the allegations in the preceding paragraphs of this First Amended Complaint as if set forth fully herein.

100.     NetApp remains a leader in the industry it helped create, in large part, because it devotes tremendous resources to the development of new technologies and processes.

101.     NetApp has made reasonable efforts under the circumstances to preserve the confidentiality of its trade secret information taken by Weber, Klute and Nimble.  Such information derives independent economic value from not being generally known to the public or to other

persons who can obtain economic value from their disclosure or use.  Accordingly, the above-described information constitutes "trade secrets" under California's Uniform Trade Secrets Act, California Civil Code §§ 3426 *et seq.*

102.   NetApp's current and former employees, including Weber and Klute, have been and continue to be, under a duty to keep NetApp's proprietary and confidential information secret, and not to use or disclose such information other than for the benefit of NetApp and with NetApp's authorization.  Both Klute and Weber knew, and expressly acknowledged in their respective employment agreements, that by acquiring NetApp confidential and proprietary information they were under a duty to maintain its secrecy or limit its use.  Nevertheless, Weber and Klute disclosed this information to Nimble and to others acting in concert with Nimble, and have used and are using that information, all without the express or implied consent of NetApp.

103.   When disclosing NetApp information to Nimble, or those acting in concert with Nimble, Klute and Weber were acting within the scope of their employment.  As Klute and Weber's employer, Nimble is vicariously and jointly liable for the unlawful acts committed by Klute and Weber.

104.   Nimble acquired NetApp trade secret information from Weber and Klute, persons they knew or reasonably should have known owed a duty to NetApp to maintain the information in secrecy or acquired the information through improper means.  Upon information and belief, Nimble has subsequently used this information in connection with Nimble's business activities, in a manner adverse to NetApp's business interests.

105.   Nimble, Weber, and Klute (collectively "Trade Secret Defendants") are using NetApp's trade secrets without NetApp's express or implied consent and/or used improper means to acquire knowledge of the trade secrets.

106.   The Trade Secret Defendants obtained NetApp's trade secret, proprietary and confidential information directly or indirectly from NetApp and not from generally available information or from the Defendants' own independent research and efforts.

107.   The actions of the Trade Secret Defendants constitute misappropriation of NetApp's trade secrets under California Civil Code §§ 3426 *et seq.*

108.   Each of the acts of misappropriation was done willfully and maliciously by the Trade Secret Defendants, with the deliberate intent to injure NetApp's business, thereby entitling NetApp to exemplary damages to be proven at trial pursuant to California Civil Code § 3426.3(c).

109.   As a direct and proximate result of the Defendants' misappropriation of NetApp's trade secrets, the Trade Secret Defendants have been unjustly enriched, and NetApp has sustained damages in an amount to be proven at trial.  NetApp has suffered irreparable harm as a result of the Trade Secret Defendants' activities, and will continue to suffer irreparable injury that cannot be adequately remedied at law unless the Trade Secret Defendants, and their officers, agents and employees, and all other persons acting in concert with them, are enjoined from engaging in any further acts of misappropriation.

## FOURTH CAUSE OF ACTION
### Breach of Contract
### (Against Defendant Reynolds)

110.   NetApp incorporates by reference each of the allegations in the preceding paragraphs of this First Amended Complaint as though fully set forth here.

111.   Reynolds downloaded the Synergy software and, in doing so, accepted the terms of the applicable Use Restrictions.

112.   NetApp's offer to Reynolds of a non-exclusive, limited, royalty-free license, to install and use the Synergy software subject to the Use Restrictions, and Reynolds' acceptance of these terms as evidenced by his downloading of the Synergy software, constitutes a valid enforceable contract under California law.

113.   Reynolds breached the Use Restrictions by engaging in the unauthorized reproduction and/or distribution of the Synergy software program, data, and portions thereof.  Based on information and belief, Reynolds used the Synergy software and accessed NetApp's Synergy database and used the confidential and proprietary information contained therein against NetApp – and for the benefit of Nimble Storage – to compete unfairly in the marketplace.

114.   As a direct and proximate cause of Reynolds' breach of the Use Restriction, NetApp has suffered economic injury and damages in an amount to be proven at trial.

115.     Further, by downloading the Synergy software, Reynolds also agreed that breach of the Use Restrictions, and specifically the EULA, would "cause irreparable injury to NetApp for which monetary damages would not be an adequate remedy" and further agreed that NetApp shall be entitled to seek equitable relief in addition to any remedies it may have under the EULA or at law. Accordingly, NetApp seeks an order requiring that Reynolds give NetApp access to his books, records, systems and usage associated with the Software to verify the extent and nature of Reynolds' non-compliance with the Use Restrictions.

## FIFTH CAUSE OF ACTION
### Breach of Contract
### (Against Defendant Weber)

116.     NetApp incorporates by reference each of the allegations in the preceding paragraphs of this First Amended Complaint as if set forth fully herein.

117.     As described above, and further set forth below, Weber breached the Agreement.

118.     The Agreement is a valid and binding written agreement between NetApp and Weber.

119.     The Agreement was made between Weber and NetApp for valid consideration.

120.     NetApp performed its contractual duties under the Agreement.

121.     The Agreement between Weber and NetApp is reasonable, consonant with public policy, and necessary to protect legitimate business interests, including NetApp's confidential and proprietary information and its goodwill in the enterprise storage market.

122.     As a result of the conduct described above, Weber breached the Agreement by recruiting NetApp employees to join him at Nimble while still employed at NetApp and by failing to return and, on information and belief, continuing to use on behalf of Nimble, NetApp Company Documents and Materials.

123.     As a direct and proximate cause of Weber's breach of the Agreement, NetApp has suffered, and will continue to suffer, economic injury and damages in an amount to be proven at trial.

///

**SIXTH CAUSE OF ACTION**
**Breach of Contract**
**(Against Defendant Klute)**

124.    NetApp incorporates by reference each of the allegations in the preceding paragraphs of this First Amended Complaint as if set forth fully herein.

125.    As described above, and further set forth below, Klute breached the Agreement.

126.    The Agreement is a valid and binding written agreement between NetApp and Klute.

127.    The Agreement was made between Klute and NetApp for valid consideration.

128.    NetApp performed its contractual duties under the Agreement.

129.    The Agreement between Klute and NetApp is reasonable, consonant with public policy, and is necessary to protect legitimate business interests, including NetApp's confidential and proprietary information and its goodwill in the enterprise storage market.

130.    As a result of the conduct described above, Klute breached the Agreement by failing to return, and, on information and belief, continuing to use on behalf of Nimble, NetApp Company Documents and Materials.

131.    As a direct and proximate cause of Klute's breach of the Agreement, NetApp has suffered, and will continue to suffer, economic injury and damages in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**Breach of Contract**
**(Against Defendant Binning)**

132.    NetApp incorporates by reference each of the allegations in the preceding paragraphs of this First Amended Complaint as if set forth fully herein.

133.    As described above, Binning breached the Agreement.

134.    The Agreement is a valid and binding written agreement between NetApp and Binning.

135.    The Agreement was made between Binning and NetApp for valid consideration.

136.    NetApp performed its contractual duties under the Agreement.

-25-

137.     The Agreement between Binning and NetApp is reasonable, consonant with public policy, and is necessary to protect legitimate business interests, including NetApp's confidential and proprietary information and its goodwill in the enterprise storage market.

138.     As a result of the conduct described above, Binning breached the Agreement by failing to return and taking with him NetApp Company Documents and Materials and on information and belief, using them at Nimble.

139.     As a direct and proximate cause of Binning's breach of the Agreement, NetApp has suffered, and will continue to suffer, economic injury and damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Breach of Contract
### (Against Defendant Glick)

140.     NetApp incorporates by reference each of the allegations in the preceding paragraphs of this First Amended Complaint as if set forth fully herein.

141.     As described above, Glick breached the Agreement by failing to return, and/or deleting, making unrecoverable, inaccessible, or unavailable NetApp Company Documents and Materials prior to his termination from NetApp.

142.     The Agreement is a valid and binding written agreement between Glick and NetApp.

143.     The Agreement was made between Glick and NetApp for valid consideration.

144.     NetApp performed its contractual duties under the Agreement.

145.     The Agreement between Glick and NetApp is reasonable, consonant with public policy, and is necessary to protect legitimate business interests, including NetApp's confidential and proprietary information and its goodwill in the enterprise storage market.

146.     As a result of the conduct described above, Glick breached the Agreement by failing to return NetApp Company Documents and Materials.

147.     As a direct and proximate cause of Glick's breach of the Agreement, NetApp has suffered, and will continue to suffer, economic injury and damages in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**
**Breach of Contract**
**(Against Defendant Alduino)**

148.    NetApp incorporates by reference each of the allegations in the preceding paragraphs of this First Amended Complaint as if set forth fully herein.

149.    As described above, Alduino breached the Agreement by failing to return, and/or deleting, making unrecoverable, inaccessible or unavailable NetApp Company Documents and Materials prior to his termination from NetApp.

150.    The Agreement is a valid and binding written agreement between Alduino and NetApp.

151.    The Agreement was made between Alduino and NetApp for valid consideration.

152.    NetApp performed its contractual duties under the Agreement.

153.    The Agreement between Alduino and NetApp is reasonable, consonant with public policy, and is necessary to protect legitimate business interests, including NetApp's confidential and proprietary information and its goodwill in the enterprise storage market.

154.    As a result of the conduct described above, Alduino breached the Agreement by failing to return NetApp Company Documents and Materials.

155.    As a direct and proximate cause of Alduino's breach of the Agreement, NetApp has suffered, and will continue to suffer, economic injury and damages in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**
**Intentional Interference With Contract And Contractual Relations**
**(Against Defendants Nimble and Weber)**

156.    NetApp incorporates by reference each of the allegations in the preceding paragraphs of this First Amended Complaint as if set forth fully herein.

157.    Upon information and belief, Nimble was aware of NetApp's contracts with their former employees, including but not limited to Weber, Klute, Binning, Glick, and Alduino.

158.    Nimble interfered with the contracts Weber, Klute, and Binning had with NetApp by

inducing them to breach their obligations under their respective employment agreements by, *inter alia*, failing to return, using and disclosing NetApp's proprietary and confidential information without NetApp's permission or authorization in the development, manufacture and sale of Nimble's competing products.

159.   Nimble interfered with the contracts Glick and Alduino had with NetApp by inducing them to breach their obligations under their respective employment agreements by, *inter alia*, failing to return NetApp's Company Documents and Materials when they deleted and/or otherwise made unrecoverable, inaccessible, and/or unavailable information contained on their respective workstations prior to departing NetApp.

160.   Similar to Klute and Weber, Binning as a NetApp employee, signed a contract entitled "Proprietary Information and Inventions Agreement" (the "Agreement"), the terms of which are identical to Klute and Weber, and which remain in full force and effect today.

161.   Weber intentionally interfered with Binning's contract with NetApp by encouraging him to leave NetApp and take NetApp Company Documents and Materials before he joined Nimble in violation of the Agreement.

162.   As a proximate result of Nimble's and Weber's conduct and the above described breaches of contract, NetApp has suffered damages in an amount to be proven at trial.

163.   Nimble's and Weber's conduct specified above was willful, malicious, fraudulent, and in conscious disregard of NetApp's rights and interests, and, on information and belief, was undertaken with the intent to injure NetApp's property and legal rights.  Accordingly, an award of punitive damages is justified.

### ELEVENTH CAUSE OF ACTION
**Unfair Competition**
**California Business and Professions Code § 17200, *et seq*.**
**(Against All Defendants)**

164.   NetApp incorporates by reference each of the allegations in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

165.   NetApp is a "person" within the meaning of California Business & Professions Code Section 17201.

166.     Defendants have engaged in unlawful business acts or practices by committing some or all illegal acts and practices alleged herein and above including computer fraud, trespass to chattel, breach of contract, and interference with contract, all in an effort to gain an unfair competitive advantage over NetApp.

167.     As alleged herein, Reynolds and Nimble's conduct is "unlawful" because, among other reasons, they violated the Computer Fraud and Abuse Act and committed trespass to chattels.

168.     As alleged herein, Nimble's conduct constitutes "unfair" business practices by targeting NetApp employees and inducing them to breach their employment agreements in an effort to obtain NetApp's confidential and proprietary information without authorization.

169.     As alleged herein, Nimble and Weber's conduct constitutes "unfair" business practices by using NetApp's confidential and proprietary information to compete unfairly against NetApp in the marketplace.

170.     As alleged herein, Klute's conduct constitutes "unfair" business practices by taking NetApp Company Documents and Materials in breach of her employment agreement and using those materials for the benefit of Nimble in the marketplace, or alternatively, withholding those documents and refusing to return them, all to the detriment of NetApp.

171.     As alleged herein, Binning's conduct constitutes "unfair" business practices by taking NetApp Company Documents and Materials in breach of his employment agreement and using those materials for the benefit of Nimble in the marketplace, or alternatively, withholding those documents and refusing to return them, all to the detriment of NetApp.

172.     As alleged herein, Weber's conduct constitutes "unfair" business practices because Weber has taken NetApp Company Documents and Materials and solicited NetApp employees to leave the company in violation of his employment agreement with NetApp.

173.     As alleged herein, the conduct of Glick and Alduino constitutes "unfair" business practices by failing to return NetApp's Company Documents and Materials as a result of deleting and/or otherwise making unrecoverable, inaccessible and/or unavailable information contained on their respective NetApp workstations prior to departing NetApp in order to harm NetApp's business interests.

-29-

174.    By reason of, and as a direct and proximate result of, Defendants' unfair and unlawful practices and conduct as described above, NetApp has suffered and will continue to suffer, financial injury to its business and property in an amount to be determined at trial.

175.    The entry of a permanent and mandatory injunction against Defendants, collectively and severally, is necessary to stop these ongoing unlawful and unfair business practices.

176.    NetApp is entitled to disgorgement and/or restoration of any and all revenues, earnings, profits, compensation, and benefits Nimble obtained in violation of California Business & Professions Code § 17200 *et seq*., including, but not limited to, returning the value of the stolen property itself and any revenue earned from it.  NetApp also is entitled to injunctive relief, in that Nimble should be enjoined from further unlawful, unfair, and deceptive business practices, and Defendants should be further ordered to return all materials taken from NetApp, and all copies of such, in their possession, custody or control.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.    For entry of judgment against Defendants on all Claims for Relief;

2.    For an injunction preliminarily and permanently prohibiting the Defendants and their officers, agents, servants, employees, and all persons acting in concert with it and/or them, from directly or indirectly:

a.    Acquiring, using, possessing, disclosing, conveying, or communicating to any person any of Plaintiff's confidential or other valuable proprietary information;

b.    Manufacturing, producing, offering for sale, selling, or conveying to any person any products, systems or services produced, manufactured, or marketed using Plaintiff's confidential or other valuable proprietary information;

3.    For an order requiring that all individual Defendants give NetApp access to their laptops, hard drives, external storage media, and all other electronic media where NetApp Company Documents and Materials may be stored;

4.      For an order requiring that Nimble give NetApp access to its computer systems and servers to verify the extent and nature of NetApp Company Documents and Materials stored therein;

5.      For compensatory damages in an amount according to proof;

6.      For an award of punitive damages; and

7.      For such other relief as the Court deems just and proper.


                                        DUANE MORRIS LLP

Dated:  January 10, 2014            By:  */s/ Karineh Khachatourian*
                                        Karineh Khachatourian
                                        Patrick S. Salceda
                                        David T. Xue

                                        Attorneys for Plaintiff
                                        NETAPP, INC.

1

**DEMAND FOR JURY TRIAL**

2          Pursuant to Federal Rule of Civil Procedure 38(b), NetApp, Inc. hereby demands trial by jury

3   as to all issues in this action triable by a jury.

4

5

6                                                DUANE MORRIS LLP

7   Dated:  January 10, 2014              By:  */s/ Karineh Khachatourian*
                                               Karineh Khachatourian
8                                              Patrick S. Salceda
                                               David T. Xue
9
                                               Attorneys for Plaintiff
10                                             NETAPP, INC.

11

12  DM2\4684033.1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28