1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

NETAPP, INC.,                                          )        Case No.: 5:13-CV-05058-LHK (HRL)
                                                       )
                        Plaintiff,                     )        ORDER GRANTING IN PART AND
                                                       )        DENYING IN PART MOTION TO
            v.                                         )        DISMISS, AND GRANTING MOTION
                                                       )        TO STRIKE
                                                       )
NIMBLE STORAGE, INC., MICHAEL                          )
REYNOLDS, an individual, and Does 1-50,                )
                                                       )
                                                       )
                        Defendants.                    )
_____              )

        Plaintiff NetApp, Inc. ("NetApp") has filed this suit against Defendants Nimble Storage,

Inc. ("Nimble"), and Michael Reynolds ("Reynolds") (collectively, "Defendants"). *See* ECF No.

71 (Second Am. Compl.). Defendants move to dismiss all the claims that NetApp asserts against

Nimble and Reynolds, except for a state law breach of contract claim and claims under 18 U.S.C.

§§ 1030(a)(2)(C) and (a)(4). *See* ECF No. 74 ("Mot. Dismiss"). Defendants also move to strike

certain factual allegations and a cause of action in NetApp's Second Amended Complaint. *See*

ECF No. 73 ("Mot. Strike"). NetApp has opposed both motions. Having considered the parties'

briefing, the record in this case, and the applicable law, the Court GRANTS IN PART AND

DENIES IN PART the motion to dismiss and GRANTS the motion to strike, for the reasons stated

below.

**I.        BACKGROUND**

1

**United States District Court**
For the Northern District of California

### A.     The Parties' Relationship

NetApp and Nimble are competing companies in the data storage industry.  Second Am. Compl. ¶ 21.  Defendant Reynolds is an Australian citizen and resident who works at Nimble Storage Australia Pty Limited ("Nimble AUS"), an entity related to Defendant Nimble.  *Id.* ¶¶ 5-6. This lawsuit stems from NetApp's belief that "Nimble targeted NetApp talent and valuable confidential and non-confidential information to compete unfairly in the marketplace." *Id.* ¶ 27. NetApp alleges that "Nimble has achieved rapid growth and customer adoption" by "rely[ing] heavily on foundational information as to the internal working of NetApp's products and its proprietary business processes." *Id.* ¶ 21.

According to NetApp, Reynolds previously worked at Thomas Duryea Consulting ("TDC"), an "IT infrastructure consultancy business" in Australia.  *Id.* ¶ 35.  NetApp contracted with TDC for certain services, provided Reynolds with access to NetApp's computer systems, and offered Reynolds training courses available to NetApp employees, all subject to NetApp's restrictions on unauthorized access to and use of its systems.  *Id.* ¶¶ 37-42.  Reynolds left TDC in April 2013, and took a job with Nimble AUS, where—NetApp alleges—Reynolds accessed NetApp databases repeatedly from June through August 2013 and used confidential and proprietary information to solicit business for Nimble.  *Id.* ¶¶ 44-49.

### B.     Procedural History

On October 29, 2013, NetApp filed this lawsuit against Nimble, Reynolds, and former NetApp employees alleging multiple causes of action, including trespass to chattels and violations of the Computer Fraud and Abuse Act.  ECF No. 1, ¶¶ 59-73.  NetApp also alleged that Nimble was vicariously liable for Reynolds' actions.  *Id.* ¶¶ 59-67.  On December 20, 2013, the named Defendants collectively filed three motions to dismiss, arguing that NetApp failed to plead sufficient facts to support its claims, challenging personal jurisdiction as to Reynolds, and arguing that this Court lacked subject matter jurisdiction and supplemental jurisdiction over some of NetApp's claims.  *See* ECF Nos. 22-24.

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION TO STRIKE

United States District Court
For the Northern District of California

On January 10, 2014, NetApp filed its First Amended Complaint, adding three individual defendants. *See* First Am. Compl. ¶¶ 74-82.  NetApp alleged violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030), trespass to chattels, trade secret misappropriation, breach of contract, intentional interference with contract and contractual relations, and unfair competition. *See id.* ¶¶ 83-176.  NetApp also alleged that Nimble was vicariously liable for Reynolds' acts.  *See, e.g.*, *id.* ¶ 84.  On January 17, 2014, the Court entered an order by stipulation in which NetApp agreed to withdraw its pending motions to dismiss NetApp's original complaint.  ECF No. 39.  On February 18, 2014, Defendants filed new motions to dismiss all claims in the First Amended Complaint, again challenging the sufficiency of NetApp's pleadings and raising jurisdictional issues.  *See* ECF Nos. 40-42.  Nimble sought to dismiss NetApp's state law claims due to lack of supplemental jurisdiction, and moved to dismiss all claims for failure to state a claim or—in the alternative—for a more definite statement under Rule 12(e).  ECF No. 40.  Reynolds moved to dismiss for lack of personal jurisdiction and for failure to state any claim against him, and further sought to join and incorporate by reference the motions filed by the other defendants.  *See* ECF No. 41.  All of the former NetApp employees collectively moved to dismiss all of NetApp's allegations for lack of supplemental jurisdiction and for failure to state any claims, and also sought to join and incorporate by reference the motions filed by the other defendants.  *See* ECF No. 42.

The Court held a hearing on May 8, 2014, and on May 12, 2014, the Court granted in part and denied in part the various defendants' motions to dismiss.  *See* ECF No. 66 ("Order").  The Court denied Reynolds' motion to dismiss for lack of personal jurisdiction, and Reynolds' motion to dismiss NetApp's claim for breach of contract and claims under §§ 1030(a)(2)(C) and (a)(4) of the CFAA.  *Id.* at 21-22, 28-30, 31.  However, the Court granted Reynolds' motion to dismiss with leave to amend NetApp's CFAA claim with respect to § 1030(a)(5) due to NetApp's failure to plead the statutorily-required element of "damage," NetApp's claim of trespass to chattels, and claim of unfair competition.  *Id.*  With respect to NetApp's claims against Nimble, the Court granted with leave to amend Nimble's motion to dismiss all of NetApp's CFAA claims (on the grounds that NetApp failed to plead that Nimble was vicariously liable for Reynolds' actions),

United States District Court
For the Northern District of California

claim for trespass to chattels, and claim of unfair competition.  *Id*. at 21-22, 28-30.  The Court also declined to exercise supplemental jurisdiction over, and thus dismissed with prejudice, NetApp's state law claims against Nimble for trade secret misappropriation, intentional interference with contract and contractual relations, and unfair competition.  *Id*. at 31.  Finally, the Court declined to exercise supplemental jurisdiction over NetApp's claims for trade secret misappropriation, breach of contract, intentional interference with contract and contractual relations, and unfair competition against former NetApp employees Daniel Weber, Sandhya Klute, Timothy Binning, Neil Glick, and Christoper Alduino.[1]  *Id*. at 27-28.  The Court dismissed claims against these former employees with prejudice.  *Id*. 24-27.  The Court ordered NetApp to file an amended complaint within 21 days to cure the deficiencies identified in this First Amended Complaint.  *Id*. at 32.

On June 2, 2014, NetApp timely filed its Second Amended Complaint.  ECF No. 71.  The Second Amended Complaint winnowed NetApp's original claims down to four: (1) violations of 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), and (a)(5) asserted against Nimble and Reynolds; (2) trespass to chattels against Nimble and Reynolds; (3) breach of contract against Reynolds; and (4) unfair competition in violation of California Business and Professions Code §§ 17200, *et seq*. against Nimble and Reynolds.  *Id*. ¶¶ 50-80.  On June 19, 2014, Defendants filed the instant motion to dismiss.  ECF No. 74.  Also on June 19, 2014, Defendants moved to strike portions of the Second Amended Complaint that, according to Nimble, pertained exclusively to the state law claims that this Court previously dismissed for lack of supplemental jurisdiction.  *See* ECF No. 73.  On July 3, 2014, NetApp filed oppositions to both the motion to dismiss and motion to strike.  ECF Nos. 75 ("Opp'n Mot. Strike") & 78 ("Opp'n Mot. Dismiss").  NetApp also filed declarations supporting its oppositions with various exhibits.  ECF Nos. 76 & 79.  Nimble filed replies in support of its two motions on July 10, 2014.  ECF Nos. 80 ("Reply Mot. Dismiss") & 81 ("Reply Mot. Strike").  NetApp also filed a request for judicial notice related to its opposition to the motion to strike.  ECF No. 77.  Nimble also filed a request for judicial notice related to its motion to dismiss and motion

---

[1] NetApp alleged the claim for trade secret misappropriation against Klute and Weber, and the claim for intentional interference with contract and contractual relations against Weber.  Order at 25.  NetApp alleged its claims for breach of contract and unfair competition against all the former employees.  *Id*.

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

United States District Court
For the Northern District of California

to strike.  ECF No. 82.  NetApp also filed objections to evidence presented in Nimble's replies.[2]  ECF Nos. 83 & 84.

Finally, on July 23, 2014, NetApp filed under seal an administrative motion for leave to file a sur-reply in opposition to Defendants' motions to dismiss and strike.  ECF No. 85-3 ("Mot. File Surreply").  NetApp also filed a supporting declaration with various exhibits, some of which were filed under seal.  ECF Nos. 85 & 86.  Defendants filed an opposition on July 28, 2014 with a supporting declaration.  ECF Nos. 88 & 89.  This Court granted Nimble's motion for leave to file a sur-reply on August 4, 2014.  ECF No. 95.  On October 13, 2014, the Court ordered NetApp to file a supplemental brief on a narrow issue raised in Defendants' reply in support of its motion to dismiss.  ECF No. 99.  NetApp timely filed its supplemental brief on October 15, 2014.  ECF No. 100 ("Supp. Brief").

## II.     LEGAL STANDARDS

### A.     Motion to Dismiss Under Rule 12(b)(6)

A complaint may be dismissed as a matter of law due to lack of a cognizable legal theory, or insufficient facts to support a cognizable legal claim.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  If a plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face," the complaint may be dismissed for failure to state a claim upon which relief may be granted.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).  For purposes of ruling on a Rule 12(b)(6) motion, a court "accept[s] factual allegations in the complaint

---

[2] In the parties' October 9, 2014 joint case management statement, the parties stated that NetApp's objections to evidence were rendered moot by NetApp's subsequently filed sur-reply. *See* ECF No. 98, at 1.

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION TO STRIKE

**United States District Court**
For the Northern District of California

1    as true and construe[s] the pleadings in the light most favorable to the nonmoving party." 

2    *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

3        "Generally, the scope of review on a motion to dismiss for failure to state a claim is limited 

4    to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  However, 

5    the "court may look beyond the plaintiff's complaint to matters of public record" without 

6    converting the Rule 12(b)(6) motion into one for summary judgment.  *Shaw v. Hahn*, 56 F.3d 1128, 

7    1130 n.1 (9th Cir. 1995).  Nor is the court required to "'assume the truth of legal conclusions 

8    merely because they are cast in the form of factual allegations.'"  *Fayer v. Vaughn*, 649 F.3d 1061, 

9    1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 

10   1981)).  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat 

11   a motion to dismiss."  *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 

12   U.S. at 678.  Furthermore, "a plaintiff may plead herself out of court" if the complaint "plead[s] 

13   facts which establish that [the plaintiff] cannot prevail on [its] … claim."  *Weisbuch v. County of 

14   Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (internal quotation marks omitted).

15       **B.    Motion to Strike Under Rule 12(f)**

16       Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an 

17   insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  A Rule 

18   12(f) motion to strike serves to "avoid the expenditure of time and money that must arise from 

19   litigating spurious issues by dispensing with those issues prior to trial."  *Sidney-Vinstein v. A.H. 

20   Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).  Motions to strike are generally disfavored and 

21   "should not be granted unless the matter to be stricken clearly could have no possible bearing on 

22   the subject of the litigation. . . . If there is any doubt whether the portion to be stricken might bear 

23   on an issue in the litigation, the court should deny the motion."  *Platte Anchor Bolt, Inc. v. IHI, 

24   Inc.,* 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) (citations omitted).  "With a motion to strike, 

25   just as with a motion to dismiss, the court should view the pleading in the light most favorable to 

26   the nonmoving party."  *Id.*  "Ultimately, whether to grant a motion to strike lies within the sound 

27

28

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

1    discretion of the district court." *Cruz v. Bank of New York Mellon,* No. 12-CV-00846-LHK, 2012

2    WL 2838957, at *2 (N.D. Cal. July 10, 2012).

3    **III.    DISCUSSION**

4        **A.    Requests for Judicial Notice**

5            As an initial matter, the Court addresses both parties' requests for judicial notice. A matter

6    may be judicially noticed if it is either "generally known within the trial court's territorial

7    jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot

8    reasonably be questioned." Fed. R. Evid. 201(b). Here, Nimble requests judicial notice of a

9    certified transcript of the May 8, 2014 proceedings before this Court. *See* ECF No. 82. NetApp

10   does not oppose, and the materials are matters in the public record. *See Dawson v. Mahoney*, 451

11   F.3d 550, 551 n.1 (9th Cir. 2006) (allowing for judicial notice of court orders and proceedings).

12   Accordingly, the Court GRANTS Nimble's Request for Judicial Notice.

13           NetApp requests judicial notice of the Memorandum of Points and Authorities in Support

14   of Nimble's Demurrer to Complaint and Motion to Strike Portions of Plaintiff's Complaint, filed in

15   a concurrent action in Santa Clara County Superior Court. *See* Declaration of Patrick S. Salceda in

16   Support of NetApp's Opposition to Defendants' Motion to Strike, Ex. J, ECF No. 76-10.

17   Documents filed in previous and concurrent lawsuits are suitable for judicial notice under Rule of

18   Evidence 201(b). *See Dawson*, 451 F.3d at 551 n.1. Accordingly, NetApp's request for judicial

19   notice is GRANTED.

20       **B.    Defendants' Motion to Dismiss**

21           Defendants assert several grounds to dismiss certain claims in NetApp's Second Amended

22   Complaint. Defendants move to dismiss all of NetApp's CFAA and trespass to chattels claims

23   against Nimble under the theory that NetApp does not allege sufficient facts showing that Nimble

24   is vicariously liable for Reynolds' actions. Mot. Dismiss at 7. Defendants also move to dismiss

25   NetApp's claim under § 1030(a)(5) of the CFAA on the grounds that NetApp does not allege a

26   cognizable claim of "damage" within the meaning of the statute. *Id.* at 11-12. Finally, Defendants

27   move to dismiss NetApp's claims of trespass to chattels and unfair competition on the grounds that

28

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    these claims are superseded by the California Uniform Trade Secrets Act ("CUTSA"), and, as to

2    NetApp's claim of trespass to chattels, on the grounds that NetApp fails to sufficiently plead the

3    requisite damage. *Id.* at 12-15.  The Court will first address NetApp's allegation that Nimble is

4    vicariously liable for Reynolds' actions, then will address the sufficiency of NetApp's CFAA,

5    trespass to chattels, and unfair competition claims.

### 1.    Nimble's Vicarious Liability for Reynolds' Actions

6

7         NetApp alleges that Nimble is vicariously liable for NetApp's claims of trespass to chattels

8    and violation of the CFAA, based on three theories.  First, NetApp contends that Reynolds is

9    Nimble's employee.  Second, in the alternative NetApp claims that Nimble AUS, Nimble's

10   Australian subsidiary and Reynolds' employer, is Nimble's alter ego.  Third, with respect to

11   NetApp's CFAA claim only, NetApp alleges that Nimble is liable for Reynolds' acts because

12   Nimble and Reynolds engaged in a conspiracy.  As discussed more fully below, the Court finds

13   that NetApp has not sufficiently pled Nimble's vicarious liability on any of these grounds.

### a.    NetApp's Allegation that Reynolds is Nimble's Employee

14

15        The Court first addresses NetApp's claim that it has amended its complaint to now plead

16   that Reynolds is a direct employee of Nimble, as opposed to an employee of Nimble AUS, a

17   separate but related entity.  NetApp's Second Amended Complaint describes Reynolds as "a

18   Systems Engineer with Nimble in its Australian sales office."  Second Am. Compl. ¶ 5.  In its

19   opposition, NetApp contends that this sufficiently alleges that "Reynolds is employed *directly* by

20   Nimble."  Opp'n Mot. Dismiss at 4-5 (emphasis in original).  However, to the extent that NetApp

21   now claims that Reynolds is Nimble's *direct* employee, this assertion contradicts what NetApp

22   asserted in its First Amended Complaint.  In its First Amended Complaint, NetApp alleged that

23   Reynolds was a "Systems Engineer with Nimble Storage Australia Pty Limited . . ., the Australian

24   proprietary company controlled by Nimble."  First Am. Compl. ¶ 6.  This Court, in ruling on

25   Nimble's first-round motion to dismiss NetApp's First Amended Complaint on the issue of

26   vicarious liability, ruled that "NetApp identified 'Nimble' and 'Nimble AUS' as separate (if

27   related) entities."  ECF No. 66, at 23.  This Court also rejected NetApp's argument that "Reynolds

28

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

**United States District Court**
For the Northern District of California

1  was a Nimble employee" on the grounds that NetApp repeatedly pled "Reynolds' employment was

2  with Nimble AUS." *Id.* (internal quotation marks omitted).  The Court ultimately dismissed

3  NetApp's claim of Nimble's vicarious liability with leave to amend.

4          When a court grants a party leave to amend a complaint on a motion to dismiss, "the

5  amended complaint may only allege 'other facts consistent with the challenged pleading.'"  *Reddy*

6  *v.Litton Indus., Inc.*, 912 F.2d 291, 297 (9th Cir. 1990) (quoting *Schreiber Distrib. Co. v. Serv-Well*

7  *Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)); *Fourstar v. Murlak*, No. CV 07-5892-ODW

8  SS, 2010 WL 2163980, at *3 (C.D. Cal. Apr. 26, 2010) ("Leave to amend should be liberally

9  granted, but an amended complaint cannot allege facts inconsistent with the challenged pleading.").

10  Here, when this Court granted NetApp leave to amend its First Amended Complaint with respect to

11  NetApp's claims of vicarious liability, NetApp did not have license to amend its pleading in a way

12  that contradicted assertions NetApp made in its earlier complaint.  However, by amending its

13  complaint to plead that Reynolds was Nimble's direct employee instead of an employee of Nimble

14  AUS, this is precisely what NetApp did.  Therefore, the Court finds that NetApp fails to state a

15  claim for Nimble's vicarious liability on the basis that Reynolds is a direct employee of Nimble.

16  *See Banaga v. Taylor Bean Mortgage Co.*, No. 11-4007 JSC, 2011 WL 5056985, at *4 (N.D. Cal.

17  Oct. 24, 2011) (finding that plaintiff failed to state a claim when plaintiff's amended complaint

18  contradicted plaintiff's earlier pleadings).  Moreover, as discussed in Section III.B.1.d, *infra*, the

19  documents NetApp cites in NetApp's sur-reply do not support NetApp's claim that Reynolds is in

20  fact an employee of Nimble.

21              **b.      NetApp's Alter Ego Allegation**

22          Alternatively, Nimble alleges that Nimble AUS, Reynolds' employer, is the alter ego of

23  Nimble.  *See, e.g.*, Second Am. Compl. ¶ 6 ("Nimble is the alter ego of Nimble AUS where Nimble

24  AUS is a mere shell and instrumentality of Nimble as a conduit for a single venture.")  Under the

25  alter ego theory of liability, a parent company may be held liable for its subsidiary's conduct.  *See*

26  *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003).  The Court applies the law of the forum

27  state—here, California—in determining whether alter ego liability applies.  *Id.*  To "satisfy the alter

28

9

ego exception to the general rule that a subsidiary and the parent are separate entities, the plaintiff must establish a prima facie case (1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist; and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (internal quotation marks omitted) (alterations in original).

The first prong of the alter ego test—whether there is a unity of interest and ownership such that the separate personalities of the two entities no longer exist—"has alternatively been stated as requiring a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Id.* (internal quotation marks omitted). Specifically, where a "parent dictates '[e]very facet [of the subsidiary's] business—from broad policy decision to routine matters of day-to-day operation[]," the unity of interest and ownership test is satisfied. *Doe*, 248 F.3d at 926-27 (quoting *Rollins Burdick Hunter of S. Cal., Inc. v. Alexander & Alexander Servs., Inc.*, 206 Cal. App. 3d 1, 11 (1988)) (alteration in original). Similarly, "direct evidence of manipulative control by the parent of its subsidiaries" is illustrative of an alter ego relationship. *Inst. of Veterinary Pathology, Inc. v. California Health Labs., Inc.*, 116 Cal. App. 3d 111, 120 (Ct. App. 1981). Finally, "inadequate capitalization of a subsidiary may alone be a basis for holding the parent corporation liable for the acts of the subsidiary." *Slottow v. American Cas. Co. of Reading, Pa.*, 10 F.3d 1355, 1360 (9th Cir. 1993). However, the Ninth Circuit has stated that "[a] parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego." *Doe*, 248 F.3d at 927.

In assessing the first prong of the alter ego theory, the Court examines whether there is: (1) the commingling of funds and other assets; (2) holding out by one entity that it is liable for the debts of another; (3) identical equitable ownership of the two companies; (4) use of the same offices and employees; (5) use of one company as a mere shell for the other; (6) inadequate capitalization; (7) lack of segregation of corporate records; and (8) identical directors and officers. *Miller v. Int'l Bus. Machines Corp.*, C02-2118 MJJ, 2006 WL 2792416, at *5 (N.D. Cal. Sept. 26,

10

United States District Court
For the Northern District of California

1   2006) (citing *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 539 (2000)).  "To

2   sufficiently allege a theory of alter ego, plaintiffs must provide 'more than labels and

3   conclusions'—'[f]actual allegations must be enough to raise a right to relief above the speculative

4   level.'"  *Hoang v. Vinh Phat Supermarket, Inc*., No. CIV. 2:13-00724 WBS, 2013 WL 4095042, at

5   *14 (E.D. Cal. Aug. 13, 2013) (quoting *Twombly*, 550 U.S. at 555).

6          Here, NetApp makes twelve allegations that NetApp claims show there is a unity of interest

7   and ownership between Nimble and Nimble AUS: (1) that Nimble controls the business and daily

8   operations of Nimble AUS; (2) that Nimble AUS' regulatory filings declare it is 100 percent

9   owned by Nimble; (3) that Nimble is the sole member of Nimble AUS, and that three of Nimble's

10  executives are members of Nimble AUS' board of directors; (4) that Nimble's regulatory filings

11  refer to Nimble's Australian operations as a "sales office"; (5) that Nimble claims in a press release

12  that it has employees in Australia; (6) that Nimble handles administrative tasks for Nimble AUS,

13  such as recruitment, legal defense, insurance, and discipline; (7) that Nimble is paying Reynolds'

14  attorney's fees and controlling his defense; (8) that contracts are made in the name of Nimble and

15  not Nimble AUS; (9) that Nimble AUS does not pay taxes for conducting business in Australia;

16  (10) that Nimble AUS does not have separate email or a website apart from Nimble; (11) that

17  Nimble issues all press releases on behalf of Nimble AUS; and (12) according to corporate filings,

18  Nimble recognized Nimble AUS' revenue as its own.  Second Am. Compl. ¶ 6.

19         As a preliminary matter, NetApp fails to explain how several of its allegations—such as

20  that Nimble handles certain administrative tasks for Nimble AUS, that Nimble is paying Reynolds'

21  attorney's fees, or that Nimble issues press releases on behalf of Nimble AUS—are relevant to the

22  eight factors in the unity of interest and ownership inquiry.  *See Sonora Diamond Corp.*, 83 Cal.

23  App. 4th at 538-39.  NetApp states that these allegations are "indisputably . . . indicative of alter

24  ego."  Opp'n Mot. Dismiss at 9.  However, NetApp does not otherwise explain how these alleged

25  facts are applicable.  Moreover, an allegation that Nimble and Nimble AUS share certain

26  administrative functions, such as policies related to recruitment, legal defense, insurance, and

27  discipline, is not indisputably indicative of alter ego.  *See Tomaselli v. Transamerica Ins. Co.*, 25

28

11

Cal. App. 4th 1269, 1285 (1994) (noting there is no alter ego liability where, *inter alia*, parent and subsidiary shared internal policies).  In addition, NetApp does not cite any authority (and this Court did not locate any) which suggests that a parent-subsidiary's joint issuance of press releases, or the parent's payment of the attorney's fees and control of the legal defense of a subsidiary's employee, is illustrative of an alter ego relationship.  Put another way, without more explanation, NetApp's factual allegations do not suggest that Nimble "dictates every facet of [Nimble AUS'] business—from broad policy decision to routine matters of day-to-day operations," which is what the Ninth Circuit requires to satisfy the unity of interest and ownership test.  *Doe*, 248 F.3d at 926-27.

In addition, many of NetApp's alleged facts are typical of the parent-subsidiary relationship and, without more, are not suggestive of a unity of interest and ownership.  First, NetApp alleges that Nimble owns 100 percent of Nimble AUS.  Second. Am. Compl. ¶ 6.  However, "100% control" of a subsidiary by a parent "does not by itself make a subsidiary the alter ego of the parent." *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003); *see also Tomaselli*, 25 Cal. App. 4th at 1285 (noting there is no alter ego liability where, *inter alia*, parent company owned 100 percent of the subsidiary's stock).

Second, NetApp alleges that "Nimble recognizes Nimble AUS' revenue as its own as stated in its corporate filings."  Second Am. Compl. ¶ 6.  Again, however, the fact that a parent corporation reports the financial results of its subsidiaries in the parent's financial statements is not proof of an alter ego relationship, even in situations where additional unity of interest and ownership factors are alleged.  *See, e.g.*, *Inst. of Veterinary Pathology*, 116 Cal. App. 3d at 119 (no unity of interest where, *inter alia*, the parent reported the financial results of its subsidiary, owned 100 percent of the stock of a subsidiary, there were interlocking directors and executives, and the parent maintained administrative records of the subsidiary).

Third, NetApp contends that three Nimble executives are directors of Nimble AUS. Second Am. Compl. ¶ 6.  However, overlap between a parent's and a subsidiary's directors or executive leadership alone is not suggestive of a unity of interest and ownership.  This is because "[i]t is considered a normal attribute of ownership that officers and directors of the parent serve as

12

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   officers and directors of the subsidiary." *Sonora Diamond Corp*., 83 Cal. App. 4th at 548-49

2   (citing *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)); *Kramer Motors, Inc. v. British Leyland,*

3   *Ltd*., 628 F.2d 1175, 1177 (9th Cir. 1980) (fact that some directors and executives of parent

4   company sat on board of subsidiary did not support alter ego theory of liability because the record

5   "does not show that executives and directors of the [parent] ever controlled the [subsidiary] board

6   or formed a board majority").  Here, NetApp does not allege that Nimble's directors or officers

7   controlled Nimble AUS, or formed a board majority.  Accordingly, NetApp has merely alleged

8   some intercorporate connections between Nimble and Nimble AUS, which is not sufficient to

9   satisfy the unity of interest or ownership test. *Inst. of Veterinary Pathology*, 116 Cal. App. 3d at

10  120 (no alter ego liability where plaintiff "only establishes intercorporate connections between

11  Revlon, USV, and NHL.  [Plaintiff] fails to set forth any direct evidence of Revlon's manipulative

12  control of its subsidiaries which would require imposition of liability.").

13         NetApp's most direct argument as to why its allegations show an alter ego relationship is

14  that Nimble AUS is a mere "marketing conduit" for Nimble.  In support of this assertion, NetApp

15  points to its allegations that "Nimble characterizes Nimble AUS as a 'sales office' which uses

16  Nimble's website and email, and also contracts under Nimble's name."  Opp'n Mot. Dismiss at 11.

17  Based on these allegations, NetApp argues, "for customer (i.e., marketing) purposes, Nimble AUS

18  and Nimble are one and the same." *Id*.  NetApp is correct that the Ninth Circuit has stated "where

19  a parent corporation uses its subsidiary 'as a marketing conduit' and attempts to shield itself from

20  liability based on its subsidiaries' activities . . . the alter-ego test is satisfied." *Doe*, 248 F.3d at 926

21  (quoting *United States v. Toyota Motor Corp.*, 561 F. Supp. 354, 359 (C.D. Cal. 1983)).  Although

22  *Doe* enunciates the rule, *Doe* does not explain what constitutes a "marketing conduit."  Rather, *Doe*

23  cites to *Toyota Motor* for the proposition that use of a subsidiary as a "marketing conduit" can

24  satisfy the alter ego test. *See Doe*, 248 F.3d at 926 (citing *Toyota Motor Corp.*, 561 F. Supp. at

25  359).  In *Toyota Motor*, the district court denied Toyota's motion to dismiss for lack of personal

26  jurisdiction.  In so doing, the court found that a parent corporation in Japan could be subject to

27  personal jurisdiction in California where the parent's California subsidiary (1) was the exclusive

28

13

United States District Court
For the Northern District of California

1    importer of the parent's vehicles; (2) all sales were "FOB Japan" and the subsidiary handled all

2    distribution in the United States; and (3) the parent derived "substantial economic benefit" from the

3    subsidiary's activities. *Toyota Motor Corp.*, 561 F. Supp. at 356. Based on these facts, the court

4    found there was "no obstacle to jurisdiction over the foreign parent" because the parent "uses its

5    subsidiary as a marketing conduit." *Id*. at 359.

6        Here, NetApp's allegations fall far short of the facts at issue in *Toyota Motor*. In *Toyota*

7    *Motor*, the facts alleged as to the subsidiary's role as a marketing conduit for the parent were

8    specific to the subsidiary's marketing function. These facts included: that the subsidiary was the

9    exclusive importer of the parent's products, that the subsidiary coordinated distribution and sales

10   logistics in the United States, and that the parent realized specific sales and revenue figures from

11   the subsidiary. *Id*. at 356. In contrast, here NetApp does not allege any facts regarding the

12   marketing and product relationship between Nimble and Nimble AUS, or how sales and products

13   pass between Nimble and Nimble AUS, or what marketing or sales functions Nimble AUS handles

14   on behalf of Nimble. Instead, NetApp simply alleges that "Nimble characterizes Nimble AUS as a

15   'sales office,'" that Nimble and Nimble AUS share a website and email, and that contracts are

16   made "under Nimble's name." Opp'n Mot. Dismiss at 11. However the fact that Nimble

17   characterizes Nimble AUS as a division, i.e. sales office, is not unusual in a parent-subsidiary

18   relationship and does not establish the existence of an alter ego relationship. *See Doe*, 248 F.3d at

19   928 (reference by parent to subsidiary as divisions of the parent does not establish existence of alter

20   ego relationship). In addition, the allegation that Nimble and Nimble AUS share a website and

21   email is an administrative, not a marketing, function. Shared administrative functions are not

22   necessarily indicative of an alter ego relationship. *See Tomaselli*, 25 Cal. App. 4th at 1285 (fact

23   that parent and subsidiary share some administrative functions does not establish alter ego

24   liability). Similarly, the allegation that contracts are made in Nimble's name is not, on its face, a

25   marketing function that suggests Nimble AUS is a marking conduit. *See Toyota Motor Corp.*, 561

26   F. Supp. at 359 (subsidiary may be a marketing conduit such that alter ego liability is appropriate

27   where, *inter alia*, subsidiary was the exclusive importer of parent's products, and subsidiary

28

14

1    handled all the sales and distribution of the parent).  In short, NetApp does not make sufficient

2    allegations to support its argument that Nimble treats Nimble AUS as a "marketing conduit" such

3    that alter ego liability should apply.

4            Finally, NetApp's remaining contentions also fail to sufficiently allege the existence of an

5    alter ego relationship.  One of NetApp's alleged facts—that "Nimble has been controlling the

6    business and daily operations of Nimble AUS," Second Am. Compl. ¶ 6—is a mere conclusory

7    allegation.  *See Iqbal*, 556 U.S. at 678.  In addition, NetApp argues that the fact that Nimble AUS

8    allegedly recognizes no revenue and pays no taxes in Australia "suggest[s] undercapitalization."

9    Opp'n Mot. Dismiss at 6.  It is true that inadequate capitalization may be a basis for holding a

10   parent corporation liable for the acts of its subsidiary.  *Slottow*, 10 F.3d at 1360 (stating that

11   "inadequate capitalization alone may be a basis for holding the parent corporation liable for the

12   acts of the subsidiary.").  However, when determining whether inadequate capitalization exists

13   such that alter ego liability would be appropriate, courts generally look to facts or allegations

14   related to an entity's liabilities and assets.  *See, e.g.*, *Slottow*, 10 F.3d at 1360 (finding inadequate

15   capitalization where entity's "initial capitalization" was $500,000, which was "woefully

16   inadequate" relative to the entity's liabilities of at least $10 million); *Nilsson, Robbins, Dalgarn,*

17   *Berliner, Carson & Wurst v. Louisiana Hydrolec*, 854 F.2d 1538, 1543 (9th Cir. 1988) (finding

18   inadequate capitalization where entity had no assets but carried debt); *Goldman v. Seawind Grp.*

19   *Holdings Pty Ltd.*, No. CV 13-01759 SI, 2013 WL 4647492, at *3 (N.D. Cal. Aug. 29, 2013)

20   (denying motion to dismiss where plaintiff pled that entity was undercapitalized because its lack of

21   assets resulted in the entity filing for bankruptcy).  Here, NetApp makes no allegations regarding

22   Nimble AUS' assets or its liabilities.  Nor does NetApp explain why its factual allegations would

23   suggest undercapitalization, and without more this is mere speculation that is insufficient to defeat

24   a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (holding that "[w]here a complaint pleads facts that are

25   merely consistent with a defendant's liability, it stops short of the line between possibility and

26   plausibility of entitlement to relief.")  (internal quotation marks omitted).

27

28

                                                    15

United States District Court
For the Northern District of California

1    NetApp's allegations fail to show that Nimble and Nimble AUS have anything more than a

2    typical parent-subsidiary relationship.  For there to be alter ego reliability, there must be something

3    more.  *See Doe*, 248 F.3d at 926.  Therefore, the Court finds that NetApp does not sufficiently

4    allege that there is a unity of interest between Nimble and Nimble AUS such that Nimble AUS

5    should be deemed the alter ego of Nimble.[3]

6                          **c.    NetApp's Allegation of Conspiracy**

7            Finally, NetApp alleges that Nimble is vicariously liable for Reynolds' violation of the

8    CFAA because the two parties engaged in a civil conspiracy.  *See* First Am. Compl. ¶ 51.  In civil

9    conspiracy actions, "the plaintiff [must] plead at least the basic elements of the conspiracy,

10   especially the existence of an agreement."  *Wasco Products, Inc. v. Southwall Technologies, Inc.*,

11   435 F.3d 989, 990-91 (9th Cir. 2006) (citing *Montgomery v. City of Ardmore,* 365 F.3d 926, 940

12   (10th Cir. 2004)).  Accordingly, to survive a motion to dismiss, the "plaintiff must allege with

13   sufficient factual particularity that defendants reached some explicit or tacit understanding or

14   agreement." *Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1521 (N.D. Cal. 1990).  "It is not

15   enough to show that defendants might have had a common goal unless there is a *factually specific*

16   allegation that they directed themselves towards this wrongful goal by virtue of a mutual

17   understanding or agreement."  *Id*. (emphasis added).  "[C]onclusory allegations of conspiracies are

18   insufficient to support such claims."  *Wisdom v. Katz*, 539 F. App'x 704, 705 (9th Cir. 2013)

19   (citing and collecting cases).  Where, as here, a party alleges a conspiracy under the Computer

20   Fraud and Abuse Act, other courts have required specific allegations of an agreement and common

21   activities to state a claim.  *See Trademotion, LLC v. Marketcliq, Inc.*, 857 F. Supp. 2d 1285, 1294

22   (M.D. Fla. 2012) (recommending dismissal of CFAA claim due to lack of facts showing "a

23   knowing agreement with another to commit the unlawful act"); *Vacation Club Servs., Inc. v.*

24   *Rodriguez*, No. 6:10-CV-247, 2010 WL 1645129, at *2 (M.D. Fla. Apr. 22, 2010) (dismissing

25   CFAA claim where "[n]othing in the Amended Complaint . . . comes close to alleging that Morris

26   _____

     [3] Because the Court finds that NetApp has not sufficiently alleged a unity of interest between
27   Nimble and Nimble AUS, the Court need not address whether NetApp sufficiently alleges that
     failure to disregard Nimble's and Nimble AUS' separate identities would result in fraud or
28   injustice.

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

and Rodriguez conspired to violate CFAA—much less that Morris even knew of Rodriguez or that Rodriguez had access to Plaintiff's database.").

Here, NetApp alleges that Reynolds conspired with Nimble and Nimble employees who "were aware of Reynolds' ability to access NetApp's protected computers, [and] agreed to damage NetApp by . . . inducing Reynolds to breach his agreements with NetApp . . . ."  Second Am. Compl. ¶ 51.  NetApp also alleges that Reynolds and Nimble furthered the conspiracy by "cooperating with each other, encouraging each other, and ratifying and adopting" each other's acts.  *Id.*  Finally, NetApp contends that Reynolds and Nimble engaged in overt acts to further the conspiracy, including: improperly accessing and using NetApp's protected and unprotected data; "targeting NetApp employees and resellers who had access to NetApp's protected computers to provide access to Nimble"; and doing nothing to stop Reynolds, even though Nimble knew Reynolds was accessing NetApp's protected computers.  *Id.*

The Court finds that NetApp has failed to "allege with sufficient factual particularity that defendants reached some explicit or tacit understanding or agreement."  *Alfus*, 745 F. Supp. at 1521.  In its opposition, NetApp itself acknowledges that the operative inquiry in Defendants' motion to dismiss is whether "Nimble and Reynolds reached an explicit or tacit understanding with respect to the unlawful acts."  Opp'n Mot. Dismiss at 12 (internal quotation marks omitted).  Yet NetApp's pleadings fall short in this regard.  Indeed, NetApp's allegations as to whether Nimble and Reynolds reached an explicit or tacit agreement amounts to little more than the conclusory allegations that Reynolds and Nimble "agreed" to damage NetApp, and that the two "cooperat[ed] … encourage[ed] …, and ratif[ied] and adopt[ed]" each other's acts.  Second Am. Compl. ¶ 51.  NetApp pleads no facts to support any of its assertions, such as how Reynolds and NetApp agreed, cooperated, encouraged, or ratified and adopted each other's acts.  Without more factual specificity, NetApp's conclusory allegations are insufficient to survive a motion to dismiss.  *See Wisdom*, 539 F. App'x at 705; *Alfus*, 745 F. Supp. at 1521 (stating a "plaintiff must allege with sufficient factual particularity that defendants reached some explicit or tacit understanding or agreement.").  Indeed, NetApp has not substantively advanced its pleadings beyond the conclusory

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION TO STRIKE

United States District Court
For the Northern District of California

1   allegations in NetApp's First Amended Complaint that "Reynolds and Nimble conspired to commit

2   acts," First Am. Compl. ¶ 84, a claim that this Court already dismissed.  *See* Order, at 24.

3          NetApp argues that it has satisfied the specificity required to plead a civil conspiracy

4   because it "identifies four Nimble employees who were subject to agreements with NetApp, aware

5   of Reynolds' ability to access NetApp's computers, and damaged NetApp by inducing Reynolds to

6   breach his agreements with NetApp." Opp'n Mot. Dismiss at 12.  However, without more, this is

7   not sufficient to satisfy the pleading standards for conspiracy.  *See Alfus*, 745 F. Supp. at 1521

8   (dismissing conspiracy claim even though Plaintiff named specific defendants, specified "the roles

9   of each defendant in the company and the participation of each in the" alleged conspiracy, as well

10  as "certain acts" they were alleged to have committed, because the plaintiff did not plead "specific

11  facts" that the defendants reached an understanding or agreement).  Nimble also argues that a

12  conspiracy can be inferred because "[i]t is not clear what purpose Reynolds could have had in

13  accessing NetApp's protected computers after joining Nimble, other than to benefit Nimble."

14  Opp'n Mot. Dismiss at 13.  However, as previously stated, "[w]here a complaint pleads facts that

15  are merely consistent with a defendant's liability, it stops short of the line between possibility and

16  plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678.  NetApp's allegation that Reynolds

17  improperly accessed NetApp's protected computers might be consistent with Nimble's liability, but

18  it falls short of the requisite plausibility to entitle NetApp to relief.[4]

19         For the reasons stated above, the Court finds that NetApp does not allege sufficient facts to

20  hold Nimble vicariously liable for Reynolds' actions.  Therefore, the Court GRANTS Defendant's

21

22  ─────────────────────
    [4] NetApp also argues that the "scope of liability for conspiracy is broad enough to encompass those

23  whose participation in the conspiracy follows initial wrongful acts."  Opp'n Mot. Dismiss at 19.  In
    support of this statement, NetApp cites *Industrial Building Materials, Inc. v. Interchemcial Corp.*,

24  437 F.2d 1336, 1343 (9th Cir. 1971).  In *Interchemical*, the Ninth Circuit stated that, in the context
    of antitrust violations asserted under the Sherman Act and Clayton Act, "[o]ne who enters a

25  conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same
    objective, may be charged with preceding acts in furtherance of the conspiracy." *Indus. Bldg.*

26  *Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970).  This statement does
    not save NetApp, however, because NetApp fails to allege, with any particularity beyond

27  conclusory assertions, that Nimble entered a conspiracy with Reynolds, let alone that Nimble
    entered into a conspiracy "late." *See id.* at 1343.

28

18

1    motion to dismiss NetApp's CFAA and trespass to chattels claims against Nimble that are based on

2    vicarious liability.

3              **d.      Leave to Amend**

4              With respect to granting leave to amend, when dismissing a complaint for failure to state a

5    claim, "a district court should grant leave to amend even if no request to amend the pleading was

6    made, unless it determines that the pleading could not possibly be cured by the allegation of other

7    facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United*

8    *States*, 58 F.3d 494, 497 (9th Cir. 1995)).  However, a court "may exercise its discretion to deny

9    leave to amend due to . . . 'futility of amendment,'" *Carvalho v. Equifax Info. Servs., LLC*, 629

10   F.3d 876, 892-93 (9th Cir. 2010) (citation omitted), or "repeated failure to cure deficiencies by

11   amendments previously allowed," *Eminence Capital LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052

12   (9th Cir. 2003) (internal quotation marks omitted).

13             This is the second time this Court has dismissed NetApp's claims that Nimble is vicariously

14   liable for Reynolds' actions.  Order, at 23 (dismissing claim of vicarious liability against Nimble

15   where NetApp failed to plead sufficient facts).  When the Court granted Defendants' motion to

16   dismiss NetApp's claims of vicarious liability in the First Amended Complaint, the Court granted

17   NetApp leave to amend its claim and identified the grounds on which NetApp had to cure its

18   pleading.  *See, e.g.*, *id*. at 23-24 (granting leave to amend defective allegations of vicarious liability

19   so that NetApp could "address the deficiencies above.").  NetApp has failed to heed this Court's

20   instructions.

21             Moreover, this is NetApp's third complaint, and NetApp has twice had the opportunity to

22   amend its claims of vicarious liability in response to motions to dismiss.  *See* ECF Nos. 1, 34 & 71.

23   Yet, NetApp still fails to assert a viable claim.  Thus, the Court finds granting NetApp leave to

24   amend would be futile, and dismisses NetApp's claims under § 1030(a)(5) with prejudice.  *See*

25   *Eminence Capital*, 316 F.3d at 1052 (district court may deny leave to amend due to "failure to cure

26   deficiencies by amendments previously allowed" or "futility of amendment") (internal quotation

27   marks omitted).

28

**United States District Court**
For the Northern District of California

1    In its sur-reply, NetApp has requested that, should this Court dismiss NetApp's claims of

2    vicarious liability, that the Court grant NetApp leave to amend its Second Amended Complaint to

3    plead that Reynolds is a direct employee of Nimble.  NetApp claims that recently-produced

4    documents show that Reynolds is an employee of Nimble, not Nimble AUS.  *See* ECF No. 96-3, at

5    7.  However, the documents that NetApp submitted as proof of its claim do not show that Reynolds

6    is an employee of Nimble.  For instance, NetApp included with its sur-reply a copy of Reynolds'

7    employment agreement, which defines Reynolds' "employer" as "Nimble Storage Australia Pty

8    Limited," not Nimble.  ECF No. 85-5, at 2.  A stock option grant likewise defines Reynolds'

9    "employer" as "Nimble Storage Australia PTY Limited."  ECF No. 85-6.  An employee proprietary

10   information and inventions assignment agreement similarly submitted with NetApp's sur-reply

11   identifies the agreement as between Reynolds and "Nimble Storage, Inc. *or any of its subsidiaries*."

12   (emphasis added).  In short, these documents do not show that Nimble is Reynolds' employer.

13   Indeed, they appear to support the proposition that Reynolds is employed by Nimble AUS.

14   NetApp also argues that a handful of documents show that various officers of Nimble approved

15   Reynolds' hiring.  ECF No. 96-3 at 5-6.  However, as previously discussed, a parent and subsidiary

16   may share officers while still operating as distinct legal entities.  *Inst. of Veterinary Pathology*, 116

17   Cal. App. 3d at 120.  Therefore, the mere fact that some officers of Nimble were involved in

18   Reynolds' hiring is not proof that Reynolds is a Nimble employee.

19   Moreover, upon dismissal of a complaint, "[l]eave to amend is warranted if the deficiencies

20   can be cured with additional allegations that are consistent with the challenged pleading and that *do*

21   *not contradict the allegations in the original complaint*."  *United States v. Corinthian Colleges*,

22   655 F.3d 984, 995 (9th Cir. 2011) (internal quotation marks omitted) (emphasis added).  A district

23   court is within its discretion to deny leave to amend upon granting a motion to dismiss, where the

24   plaintiff's proposed amendments would contradict earlier pleadings.  *Reddy*, 912 F.2d at 297.  As

25   previously discussed, *supra*, Section III.B.1.a, any amendment that Reynolds is a direct employee

26   of Nimble would contradict the allegations NetApp made in its First Amended Complaint that

27   Reynolds was an employee of a separate entity, Nimble AUS.  Moreover, NetApp has not

28

20

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

United States District Court
For the Northern District of California

1    produced, as it claimed, evidence showing that Reynolds is a Nimble employee.  For this additional

2    reason, any amendment to the effect that Reynolds is a direct employee of Nimble would be futile.

3           For the reasons stated above, NetApp's claims of Nimble's vicarious liability are dismissed

4    with prejudice.  *See Eminence Capital*, 316 F.3d at 1052 (district court may deny leave to amend

5    due to "failure to cure deficiencies by amendments previously allowed" or "futility of

6    amendment") (internal quotation marks omitted).

7                    **2.    NetApp's CFAA Claims**

8           The Court next addresses Nimble's motion to dismiss certain of NetApp's claims under the

9    Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA").  "The CFAA prohibits a number of

10   different computer crimes, the majority of which involve accessing computers without

11   authorization or in excess of authorization, and then taking specified forbidden actions, ranging

12   from obtaining information to damaging a computer or computer data." *LVRC Holdings LLC v.*

13   *Brekka*, 581 F.3d 1127, 1131 (9th Cir. 2009) (citing 18 U.S.C. § 1030(a)(1)-(7)).  Here, Nimble

14   moves to dismiss NetApp's claims under § 1030(a)(5).  Mot. Dismiss at 11-12.  Unlike the

15   CFAA's other causes of action, § 1030(a)(5) requires that the accused cause "damage" to data,

16   system, information, or a program.  In relevant part, the CFAA imposes liability on whomever:

> (A) knowingly causes the transmission of a program, information, code, or
> command, and as a result of such conduct, intentionally causes damage without
> authorization, to a protected computer;
> (B) intentionally accesses a protected computer without authorization, and as a
> result of such conduct, recklessly causes damage; or
> (C) intentionally accesses a protected computer without authorization, and as a
> result of such conduct, causes damage and loss.

21   18 U.S.C. § 1030(a)(5).  Section 1030(e)(8) defines "damage" as "any impairment to the integrity

22   or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).

23          NetApp alleges that Reynolds caused "damage" to NetApp's computers, and thereby

24   violated § 1030(a)(5), in three ways: (1) that Reynolds "cop[ied] certain information from

25   NetApp's protected computers and transferr[ed] it to a non-secure area or device"; (2) that

26   Reynolds "diminish[ed] the value of NetApp's data by compromising its exclusivity, for which it

27   derives value because it is not available to competitors"; and (3) that Reynolds "alter[ed] or

28

21

1    modif[ied] NetApp's performance data contained on its protected computers." *Id.* ¶ 54.

2    Defendants argue that none of these allegations plead a cognizable claim of "damage" within the

3    meaning of the CFAA because NetApp has not alleged that Reynolds' alleged actions "impair[ed]

4    the integrity or availability of any part of NetApp's systems—he did not crash NetApp's systems,

5    delete data, or prevent any other user's access."  Mot. Dismiss at 12.  NetApp counters that merely

6    "rendering a computer system less secure should be considered 'damage' under § 1030(a)(5)[],

7    even when no data, program, or system is damaged or destroyed."  Opp'n Mot. Dismiss at 15

8    (internal quotation marks omitted).  The Court will address the sufficiency of each of NetApp's

9    allegations in turn.

10        First, NetApp alleges that Reynolds "cop[ied] certain information from NetApp's protected

11   computers and transferr[ed] it to a non-secure area or device."  Second Am. Compl. ¶ 54.  The

12   Ninth Circuit has not addressed whether the copying of information, without more, states a

13   cognizable claim of "damage" under the CFAA.  In addition, district courts are divided on this

14   issue.  The majority of district courts to have considered the question agree that the mere copying

15   of information does not plead a recognizable claim of "damage" under § 1030(a)(5).  *See, e.g.*,

16   *Capitol Audio Access, Inc. v. Umemoto*, 980 F. Supp. 2d 1154, 1157-58 (E.D. Cal. 2013) (rejecting

17   claim that "access to a publication and the disclosure of its information satisfies the CFAA's

18   definition of damage"); *Garelli Wong & Associates, Inc. v. Nichols*, 551 F. Supp. 2d 704, 710

19   (N.D. Ill. 2008) (where information has been misappropriated through the use of a computer, "we

20   do not believe that such conduct alone can show 'impairment to the integrity or availability of data,

21   a program, a system, or information.'") (quoting 18 U.S.C. § 1030(e)(8)); *Landmark Credit Union*

22   *v. Doberstein*, 746 F. Supp. 2d 990, 993 (E.D. Wis. 2010) (allegation that "defendant accessed and

23   disclosed information from Landmark's computer" does not plead a cognizable claim of

24   "damage"); *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 743-44 (N.D. Ill. 2009)

25   ("Plaintiff does not contend that Spear destroyed USG data. Rather, it alleges he disclosed USG

26   data improperly. This does not constitute damage under the CFAA."); *Motorola, Inc. v. Lemko*

27   *Corp.*, 609 F. Supp. 2d 760, 769 (N.D. Ill. 2009) (where only harm alleged is the disclosure to a

28

**United States District Court**
For the Northern District of California

22

competitor of confidential information, "[t]he CFAA's definition of damage does not cover such harm"); *New S. Equip. Mats, LLC v. Keener*, 989 F. Supp. 2d 522, 530 (S.D. Miss. 2013) ("[T]he mere copying of electronic information from a computer system is not enough to satisfy the CFAA's damage requirement.") (internal quotation marks omitted); *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.*, 616 F. Supp. 2d 805, 811 (N.D. Ill. 2009) (copying electronic files from a computer database—even when the ex-employee e-mails those files to a competitor—is not enough to satisfy the damage requirement of the CFAA); *Lockheed Martin Corp. v. Speed*, No. 6:05-CV-1580-ORL-31, 2006 WL 2683058, at *8 (M.D. Fla. Aug. 1, 2006) (the "copying of information from a computer onto a CD or PDA is a relatively common function that . . . does not" constitute a claim of damage under the CFAA); *Worldspan, L.P. v. Orbitz, LLC*, No. 05 C 5386, 2006 WL 1069128, at *5 (N.D. Ill. Apr. 19, 2006) (given the CFAA's definition of "damage" and "integrity," "we reject Worldspan's argument that the mere 'taking of information' constitutes 'damage' under the CFAA."); *see also NovelPoster v. Javitch Canfield Grp.*, No. 13-CV-05186-WHO, 2014 WL 5594969, at *6 (N.D. Cal. Nov. 3, 2014) (recognizing that "the mere copying of data is not enough" to state a claim of damage under the CFAA).

Moreover, these courts have decided the mere copying of information does not constitute "damage" where, as NetApp alleges here, a former employee is accused of taking information from his former employer to give to a competitor. *See, e.g.*, *Del Monte Fresh Produce*, 616 F. Supp. 2d at 811 (no cognizable claim of "damage" under the CFAA where an ex-employee e-mails former employer's files to a competitor); *Keener*, 989 F. Supp. 2d at 530 (no cognizable claim of "damage" under the CFAA where ex-employee copied employer's information to an external hard drive and shared it with a competitor); *Speed*, 2006 WL 2683058, at *8 (no cognizable claim of "damage" under the CFAA where former employees copied employer's information to CDs and personal digital assistants to give to competitor).

Courts that have decided that the copying of information is not "damage" within the scope of the CFAA base their holdings on at least one of three premises. First, these courts point out that the CFAA "is not intended to expansively apply to all cases where a trade secret has been

misappropriated by use of a computer." *U.S. Gypsum Co.*, 670 F. Supp. 2d at 744; *see also Condux Int'l, Inc. v. Haugum*, No. CIV 08-4824 ADM/JSM, 2008 WL 5244818, at *8 (D. Minn. Dec. 15, 2008) (finding no allegation of "damage" within the CFAA even where defendant's "alleged activities may well have compromised or diminished the confidentiality, exclusivity, or secrecy of the proprietary information that had been expressed in the form of computer data").  Second, these courts point out that to state a claim for damage, the CFAA requires "impairment to integrity . . . of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).  These courts also note that typically, the mere copying of information does not, without more, impinge on that information's "integrity."  *Resdev, LLC v. Lot Builders Ass'n, Inc.*, No. 6:04-CV-1374, 2005 WL 1924743, at *5 n.3 (M.D. Fla. Aug. 10, 2005) (based on the ordinary definition of "integrity" as meaning "wholeness" or "soundness," "integrity" as used in the CFAA means "some diminution in the completeness or usability of data or information"); *Worldspan, L.P.*, 2006 WL 1069128, at *5 (citing the dictionary definition of integrity as "an unimpaired or unmarred condition: entire correspondence with an original condition: SOUNDNESS" in finding that copying information did not constitute damage).  Finally and relatedly, these courts have generally required that there be actual damage to data, information, a program, or system in order to state a claim under the relevant provision of the CFAA.  Such damage occurs where there is "the destruction, corruption, or deletion of electronic files, the physical destruction of a hard drive, or any diminution in the completeness or usability of the data on a computer system."  *Keener*, 989 F. Supp. 2d at 529 (internal quotation marks omitted); *see also Doberstein*, 746 F. Supp. 2d at 993-94 ("Congress crafted Section 1030(a)(5)(B) of the CFAA because of a concern to thwart 'attacks by disgruntled programmers who decide to trash the employer's data system on the way out' of the company.") (quoting *Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418, 419 (7th Cir. 2006)).  Typically, the mere copying of information does not result in such destruction.  *See Keener*, 989 F. Supp. 2d at 529.

On the other side of the issue, some district courts have found that the copying of information, without more, can constitute a claim of damage within the meaning of the CFAA.

24

*Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.* is the leading case in this Circuit on this question. 119 F. Supp. 2d 1121.  In *Shurgard*, defendant and plaintiff were direct competitors in the self-storage industry.  *Id*. at 1122-23.  Defendant hired one of plaintiff's employees who had access to confidential and proprietary information on the plaintiff's computers.  *Id*. at 1123.  The employee, while still employed by the plaintiff but allegedly acting at the direction of the defendant, accessed the plaintiff's computer system and e-mailed the defendant plaintiff's trade secrets and other proprietary information, but did not otherwise damage plaintiff's computers.  *Id*.  The question before the *Shurgard* court was whether the actions of the employee had caused "damage" within the meaning of the CFAA.  *Id*. at 1126.  The *Shugard* court examined and quoted a Senate Report that accompanied amendments made to the CFAA in 1996, and which added the statute's definition of "damage":

> [I]t is not always clear what constitutes "damage."  For example, intruders often alter existing log-on programs so that user passwords are copied to a file which the hackers can retrieve later.  After retrieving the newly created password file, the intruder restores the altered log-on file to its original condition.  Arguably, in such a situation, neither the computer nor its information is damaged.  Nonetheless, this conduct allows the intruder to accumulate valid user passwords to the system, requires all system users to change their passwords, and requires the system administrator to devote resources to resecuring the system.  Thus, although there is arguably no "damage," the victim does suffer "loss."  If the loss to the victim meets the required monetary threshold, the conduct should be criminal, and the victim should be entitled to relief.

S. Rep. No. 104-357, at 11 (1996).[5]  The *Shugard* court found that the example given in the Senate report was analogous to the case at issue, where the former employee of the plaintiff collected and disseminated confidential information, without otherwise harming the plaintiff's computers. 119 F. Supp. 2d at 1127 ("In both cases no data was physically changed or erased, but in both cases an impairment to integrity occurred.")  *Id.*  The *Shurgard* court therefore found that the plaintiff had pled a claim of "damage" under the CFAA.  *Id*.

---

[5] The amendments to the CFAA that accompanied the 1996 Senate Report defined "damage" as "any impairment to the integrity or availability of data, a program, a system, or information that," *inter alia*, "causes loss aggregating at least $5,000 in value during any 1-year period to one or more individuals."  18 U.S.C. § 1030(e)(8)(A) (1996).  The definition of damage has since been amended to be "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).

25

United States District Court
For the Northern District of California

1    NetApp, in support of its position that Reynolds' alleged copying of information caused

2 "damage" within the meaning of the CFAA, cites to *Shurgard*, as well as several cases with similar

3 holdings.  Nearly all of these cases also cite and rely on the reasoning in *Shurgard*.  Opp'n Mot.

4 Dismiss at 17; *Multiven v. Cisco*, 725 F. Supp. 2d 887, 894-95 (N.D. Cal. Jul. 20, 2010) (citing

5 *Shurgard* for the proposition that it is "not necessary for data to be physically changed or erased to

6 constitute damage"); *Therapeutic Research Faculty v. NBTY, Inc.*, 488 F. Supp. 2d 991, 996 (E.D.

7 Cal. 2007) (citing and quoting *Shurgard* for the proposition that the disclosure of information may

8 constitute an impairment to the integrity of data or information even though "no data was

9 physically changed or erased"); *HUB Grp., Inc. v. Clancy*, No. CIV.A. 05-2046, 2006 WL 208684,

10 at *3 (E.D. Pa. Jan. 25, 2006) (citing *Shurgard*, as well as other cases that themselves cite

11 *Shurgard*, in finding that the "unauthorized access to confidential information" constituted a claim

12 of damage).[6]

13    The Court finds that the mere copying of information does not constitute a claim of

14 "damage" within the meaning of the CFAA.  As previously discussed, the statutory definition of

15 "damage" in the CFAA is "any impairment to the integrity of data, a program, a system, or

16 information."  18 U.S.C. § 1030(e)(8).  NetApp contends that the copying of information impairs

17 that information's "integrity."  Opp'n Mot Dismiss at 14.  The legislative history of the CFAA does

18 not define the term "integrity."  However, district courts that have considered the meaning of

19 "integrity" in the CFAA have noted that the word typically means "an unimpaired or unmarred

20 condition" or "soundness."  *See Worldspan*, 2006 WL 1069128, at *5; *see also Resdev*, 2005 WL

21 1924743, at *5 ( "integrity . . . ordinarily means 'wholeness' or 'soundness'").  Therefore, the

---

[6] NetApp also cites *Black & Decker (US), Inc. v. Smith*, 568 F. Supp. 2d 929 (2008), in support of
its argument that copying information and transferring it to a non-secure area or device constitutes
"damage."  *Black & Decker* cites the same legislative history as *Shurgard*, and accordingly its
reasoning is the same as the *Shurgard* court's.  *See* 568 F. Supp. 2d at 937 (citing and discussing S.
Rep. No. 104-357 (1996) in support of holding that the copying of information constituted claim of
"damage").  NetApp also cites  *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*, 307 F.
Supp. 2d 521 (S.D.N.Y. 2004), in support of its argument.  Although the *I.M.S.* court found that the
copying of information from the plaintiff's computer system constituted damage, the court did not
explain the basis for its reasoning.  307 F. Supp. 2d at 525.  Accordingly *I.M.S.* is not particularly
instructive on this issue.

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

1   copying of information could damage that information's integrity if, for instance, the information's

2   wholeness or soundness was affected.  However, simply copying information, as NetApp alleges

3   here, without otherwise affecting the wholeness or soundness of the information, would not impair

4   the information's "integrity" as that term is commonly defined.  Moreover, in this Court's prior

5   order dismissing NetApp's claim under § 1030(a)(5), the Court stated that NetApp failed to plead

6   that Reynolds "damaged any systems or destroyed any data."  Order at 22.  NetApp's amendment

7   to the effect that Reynolds copied information from NetApp's computer systems similarly fails to

8   plead that Reynolds damaged or destroyed any data, systems, program, or information.  Finally, the

9   Court notes that while the Ninth Circuit has not addressed the definition of "damage" within the

10  CFAA, the Ninth Circuit has cautioned against interpreting the CFAA in a way that would

11  "transform the CFAA from an anti-hacking statute into an expansive misappropriation statute."

12  *United States v. Nosal*, 676 F.3d 854, 857 (9th Cir. 2012) (en banc).  Interpreting the term

13  "damage" within the CFAA to encompass the simple copying of information risks doing precisely

14  that.  Any digital misappropriation necessarily involves the copying of information, and therefore

15  any digital misappropriation of information would result in liability under § 1030(a)(5).  This is the

16  outcome against which the Ninth Circuit, as well as other courts, warned. *See, e.g.*, *id.*; *U.S.*

17  *Gypsum Co.*, 670 F. Supp. 2d at 744 (N.D. Ill. 2009)

18        The Court is also ultimately unpersuaded by the reasoning of the *Shurgard* line of cases.

19  *Shurgard* and its progeny rely on the Senate report which accompanied the 1996 amendments to

20  the CFAA for support of the proposition that copying and disseminating information, without

21  more, constitutes a claim of damage.  However, the Senate report gave a specific example of

22  conduct that, while it "arguably" causes "no 'damage,'" was punishable by the CFAA, and that is

23  where hackers "alter existing log-on programs so that user passwords are copied to a file which the

24  hackers can retrieve later."  S. Rep. No. 104-357, at 11 (1996).  The Senate Report says nothing

25  about imposing liability under § 1030(a)(5) for the taking of *information*.  In addition, the Court is

26  not convinced that the taking of passwords is analogous to the taking of information.  Stealing

27  passwords necessarily compromises the security of a computer system and increases the risk of

28

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

United States District Court
For the Northern District of California

1  further damage, because it enables hackers to later access password-protected computer systems,

2  information, programs, and data.  *See* S. Rep. No. 104-357, at 11 (1996) (noting that the conduct of

3  copying and retrieving password files "allows the intruder to accumulate valid user passwords to

4  the system").  Therefore, it is not surprising that Congress would want to impose liability for the

5  copying of passwords.  In contrast, copying *information* does not necessarily render computer

6  systems less secure, because copying information on its own does not necessarily allow a hacker to

7  access other systems, programs, or data.  Furthermore, neither NetApp, nor the *Shurgard* court, nor

8  this Court identified any legislative history indicating Congressional intent to impose § 1030(a)(5)

9  liability for misappropriating information.[7]

10      For the above reasons, the Court finds that NetApp's allegation that Reynolds "cop[ied]

11  certain information from NetApp's protected computers and transferr[ed] it to a non-secure area or

12  device" fails to state a cognizable claim of "damage" within the meaning of the CFAA.

13      NetApp's remaining two allegations likewise fail to claim the requisite "damage."  First,

14  NetApp contends that Reynolds' actions caused damage to NetApp because they "diminish[ed] the

15  value of NetApp's data by compromising its exclusivity, for which it derives value because it is not

16  available to competitors."  Second Am. Compl. ¶ 54.  The CFAA's definition of "damage,"

17  however, requires that there be "impairment to the integrity or availability" of data.  18 U.S.C.

18  § 1030(e)(8).  Moreover, NetApp cites no authority for the proposition that diminishment in value

19  equates to an "impairment to . . . integrity."  Therefore, the harm alleged here falls outside the

20  statute's definition of damage.  In addition, the Court notes that this claim is essentially the same as

21  the allegation that NetApp raised in its First Amended Complaint, which this Court previously

22  dismissed with leave to amend.  *See* Order at 22 (finding that NetApp's claim that "its databases

---

23  [7] To the extent a party seeks to impose liability for the copying of information, the CFAA provides
24  other avenues besides § 1030(a)(5).  For instance, § 1030(a)(2)(C) imposes liability on whomever
     "intentionally accesses a computer without authorization or exceeds authorized access, and thereby
25  obtains [] information from a protected computer."  18 U.S.C. § 1030(a)(2)(C).  In addition,
     § 1030(a)(4) imposes liability on whomever "knowingly and with intent to defraud, accesses a
26  protected computer without authorization or exceeds authorized access," and thereby "obtains
     anything of value."  18 U.S.C. § 1030(a)(4).  Neither § 1030(a)(2) nor § 1030(a)(4) requires that
27  the accused cause "damage."  In the instant lawsuit, NetApp also alleges Reynolds violated both
     § 1030(a)(2)(C) and § 1030(a)(4).  Second Am. Compl. ¶¶ 52-53.  These allegations against
28  Reynolds are not at issue in the instant motion to dismiss.

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

**United States District Court**
For the Northern District of California

1    were damaged because that information derives value from its exclusivity" does not "plead facts

2    showing any cognizable damage under the CFAA.")  Furthermore, if NetApp's allegation that

3    diminishing the value of data by "compromising its exclusivity" stated a cognizable claim of

4    damage, any misappropriation of trade secrets or confidential information would also state a claim

5    of "damage," as misappropriation necessarily diminishes the value of confidential information by

6    impairing its confidentiality.  As previously stated, the Ninth Circuit has frowned upon such a

7    broad interpretation of the CFAA.  *Nosal*, 676 F.3d at 857.  Therefore, NetApp fails to plead a

8    claim of "damage" within the meaning of the CFAA by simply alleging that Reynolds diminished

9    the value of NetApp's data by compromising its exclusivity.

10       Finally, NetApp alleges that Reynolds caused "damage" because Reynolds "alter[ed] or

11   modif[ied] NetApp's performance data contained on its protected computers."  Second Am.

12   Compl. ¶ 54.  As discussed previously, the CFAA's definition of "damage" requires "impairment

13   to the integrity or availability" of data.  18 U.S.C. § 1030(e)(8).  Here, NetApp does not describe

14   how Reynolds altered or modified NetApp's performance data.  The only facts NetApp alleges in

15   support of its claim is that Reynolds "accessed NetApp's protected computers on a variety of

16   occasions" and "downloaded" NetApp information.  *Id*. ¶¶ 44, 47.  Therefore, according to

17   NetApp's operative Complaint, the only basis upon which Reynolds could have altered or modified

18   NetApp's performance data was by accessing and downloading information.  *See id*.  NetApp

19   makes no allegation that Reynolds deleted information, or otherwise altered or modified the

20   information he accessed.  Thus, on these facts, NetApp fails to plead any "impairment" as required

21   by statute.

22       For the reasons stated above, the Court finds NetApp does not allege a claim of "damage"

23   under the CFAA and GRANTS Defendants' motion to dismiss NetApp's claims under

24   § 1030(a)(5).  Moreover, this is the second time that this Court has dismissed NetApp's claims

25   under § 1030(a)(5)  for failure to adequately plead "damage" as required by statute.  Order at 21-

26   22.  Furthermore, this is NetApp's third complaint, and NetApp has twice had the opportunity to

27   amend its claim under the CFAA in response to motions to dismiss.  *See* ECF Nos. 1, 34 & 71.

28

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

United States District Court
For the Northern District of California

1  Yet, NetApp still fails to assert a viable claim.  Thus, the Court finds granting NetApp leave to

2  amend would be futile, and dismisses NetApp's claims under § 1030(a)(5) with prejudice.  *See*

3  *Eminence Capital*, 316 F.3d at 1052 (district court may deny leave to amend due to "failure to cure

4  deficiencies by amendments previously allowed" or "futility of amendment") (internal quotation

5  marks omitted).

6  **3.    Preemptive Effect of California's Uniform Trade Secrets Act**

7  Defendants have argued that NetApp's causes of action for trespass to chattels and unfair

8  competition (Cal. Bus. & Prof. Code § 17200) are preempted by California's Uniform Trade

9  Secrets Act ("CUTSA").  Mot. Dismiss at 13-15.  By statute, CUTSA supersedes other civil

10  remedies based on trade secret misappropriation.  Cal. Civ. Code § 3426.7(b)(2) ("This title does

11  not affect . . . other civil remedies that are not based upon misappropriation of a trade secret.").

12  California courts have ruled that "CUTSA's 'comprehensive structure and breadth' suggest[] a

13  legislative intent to occupy the field," and that CUTSA preempts common law claims that are

14  "based on the same nucleus of facts as the misappropriation of trade secrets claim for relief."  *K.C.*

15  *Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 954-58 (2009)

16  (internal quotation marks omitted).  However, CUTSA does not affect "contractual remedies" and

17  civil remedies "that are not based upon misappropriation of a trade secret."  *Silvaco Data Sys. v.*

18  *Intel Corp.*, 184 Cal. App. 4th 210, 233 (2010), *disapproved on other grounds by Kwikset Corp. v.*

19  *Superior Court*, 51 Cal. 4th 310 (2011).  Federal courts have followed California courts'

20  interpretation of the preemptive effect of the CUTSA.  *See, e.g.*, *Mattel, Inc. v. MGA Entm't, Inc.*,

21  782 F. Supp. 2d 911, 987 (C.D. Cal. 2010).

22  The test for whether a claim overlaps with the CUTSA involves "a factual inquiry, one that

23  examines the conduct alleged in the claim."  *K.C. Multimedia*, 171 Cal. App. 4th. at 958.  Under

24  this inquiry, courts have found that CUTSA can preempt claims for unfair competition and trespass

25  to chattels.  *Id.* at 961-62 (affirming preemption ruling because "appellant's statutory unfair

26  competition claim rests squarely on its factual allegations of trade secret misappropriation");

27  *Sunpower Corp. v. SolarCity Corp.*, No. 12-CV-00694-LHK, 2012 WL 6160472, at *12-13 (N.D.

28

30

Cal. Dec. 11, 2012) (dismissing claims of trespass to chattels and unfair competition because "each of SunPower's Non-Trade Secret Claims alleges in essence that Defendants violated SunPower's rights by acquiring, disclosing, and/or using, without consent (*i.e.* misappropriating) SunPower's proprietary information.").  In addition, a claim for the improper taking of *non-trade secret* information is superseded by CUTSA "[i]f the basis of the alleged property right is in essence that the information is 'not … generally known to the public,'" because that claim is "sufficiently close to a trade secret claim that it should be superseded."  *Id.* at *5 (quoting Cal. Civ. Code § 3426.1(d)(1); *see also id.* at *4-*5 (citing and discussing the reasoning in *Silvaco*, 184 Cal. App. 4th at 239 n.22, as the basis for why CUTSA can supersede claims based on the misappropriation of non-trade secret information); *Mattel*, 782 F. Supp. at 987 ("In an effort to align with the California courts that have addressed this issue, the Court concludes that CUTSA supersedes claims based on the misappropriation of confidential information, whether or not that information meets the statutory definition of a trade secret.").

### a.    Preemption of NetApp's Trespass to Chattels Claim

With these principles in mind, the Court examines NetApp's trespass to chattels claim first. NetApp argues that its trespass to chattels claim, as alleged in the Second Amended Complaint, is based on a property right that is not reliant on the fact that the information taken was confidential or generally not known to the public.  In the Second Amended Complaint, NetApp contends that its protected computer systems, of which Reynolds is accused of breaching, are "repositories of valuable non-confidential information such as certain training materials and company information that NetApp has invested substantial time and money preparing and to which Reynolds and Nimble . . . have benefitted by not having to spend the time and resources to scour publicly available NetApp information."  Second Am. Compl. ¶ 61.  Second, NetApp alleges that the information is "corporate employee work product using NetApp resources to develop."  *Id*.  Third, NetApp alleges that the information Reynolds is accused of taking is "considered copyrighted material." *Id*.

31

United States District Court
For the Northern District of California

As a preliminary matter, the Court notes that although NetApp's allegations are decidedly vague, they may still be subject to CUTSA preemption.  NetApp alleges that Reynolds took "non-confidential information such as certain training materials and company information," and benefitted by "not having to spend the time and resources to scour publicly available NetApp information and digest that information so that it is readily available all in one place."  *Id.*  It appears NetApp is alleging that Reynolds took compilations of otherwise publicly available information.  *See id.*  However, it is unclear whether NetApp alleges that Reynolds *only* took publicly-available information, or if Reynolds is also alleged to have taken non-public information that NetApp considers proprietary.  To the extent NetApp's claim is based on the latter, it would be preempted by CUTSA.  *See K.C. Multimedia*, 171 Cal. App. 4th at 958 (claim preempted by CUTSA where the conduct alleged overlaps with the rights established by CUTSA).  Moreover, assuming that NetApp alleges that Reynolds took only compilations of publicly-available information, under California law such material may still receive trade secret protection.  *See Primetech Corp. v. Cohen*, No. G038433, 2008 WL 1899976, at *4 (Cal. Ct. App. Apr. 30, 2008) (noting that California courts "recognized a protectable trade secret may include a data compilation consisting of publically available information").  This rule of trade secret protection could apply if there is, *inter alia*, evidence that the party that compiled the publicly available information expended substantial resources in doing so.  *See id.*; *see also ReadyLink Healthcare v. Cotton*, 126 Cal. App. 4th 1006, 1020 (2005) (publicly available information regarding plaintiff's lists of hospitals and nurses may receive trade secret protection because there was "substantial evidence establishing that ReadyLink's lists of hospitals and nurses . . . were procured by substantial time, effort, and expense.").  If this rule of trade secret protection applied here, then it would provide another basis of CUTSA preemption.  *K.C. Multimedia*, 171 Cal. App. 4th at 958.

However, even assuming that NetApp's claim of trespass to chattels was not preempted by CUTSA, the Court concludes that NetApp's claim should be dismissed because NetApp fails to allege the existence of a source of positive law that grants NetApp a property right in the information Reynolds allegedly took.  As Defendants correctly point out in their motion to dismiss,

32

in order for the taking of information to constitute wrongdoing, the information must be "property" as defined by some source of positive law.  Mot. Dismiss at 15; *see also SunPower*, 2012 WL 6160472, at *5 ("In order for the taking of information to constitute wrongdoing, the information must be property. Information is not property unless some positive law makes it so.") (internal quotation marks omitted); *Silvaco*, 184 Cal. App. 4th at 239 n.22 (if allegedly taken information is not "made property by some provision of positive law," then it "belongs to no one, and cannot be converted or stolen.").

Here, NetApp claims two sources of positive law exist.  First, NetApp claims that the information is "corporate employee work product" developed by NetApp "using NetApp resources."  Second Am. Compl. ¶ 61.  To the extent that NetApp claims a property right in "corporate employee work product" because NetApp considers such work product to be proprietary, NetApp's claim would be preempted by CUTSA.  *See SunPower*, 2012 WL 6160472, at *12-13 (dismissing claim of trespass to chattels where the claim was premised on allegation that "Defendants violated SunPower's rights by acquiring, disclosing, and/or using, without consent (i.e. misappropriating) SunPower's proprietary information.").  To the extent that NetApp claims a property right in "corporate employee work product" that is not a trade secret, NetApp cites no source of positive law as the basis for such a right.  The only authority NetApp cites is California Labor Code § 2860, which provides in relevant part that "[e]verything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer."  Cal. Labor Code § 2860.  However, this statute is "but an expression of the familiar principle that forbids an agent or trustee from using the trust property or powers conferred upon him for his own benefit," and it "applies to a limited class of cases, primarily involving the exploitation of an employer's confidential information or trade secrets by a former employee to the employer's detriment."  *Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 853 (1979); *id*. n.40 (citing cases).  Labor Code § 2860 does not grant NetApp a general property right for non-confidential, non-trade secret employee work product.  *See id*.  Therefore, the statute does not serve as a source of positive law for the purpose of sustaining NetApp's trespass to chattels claim.

United States District Court
For the Northern District of California

1    Second, NetApp claims that the information Reynolds allegedly took is protectable property

2  because it is "considered copyright material."  Second Am. Compl. ¶ 61.  It is unclear to the Court

3  whether NetApp is claiming the information is protectable property because it is, in fact,

4  copyrighted, or because NetApp considers it to be copyright material.  If NetApp is claiming that

5  the information is in fact copyrighted, such an allegation would indeed establish a property right.

6  However, NetApp's claim may then be preempted by the Copyright Act, although courts are

7  divided on whether the Copyright Act can preempt a trespass to chattels claim.  *Compare eBay,*

8  *Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1072 (N.D. Cal. 2000) (finding that trespass to

9  chattels claim was not preempted because a trespass to chattels claim qualitatively differs from a

10 copyright infringement claim as a matter of law) *with Ticketmaster Corp. v. Tickets.com., Inc.*, CV

11 99-7654, 2000 WL 525390, at *4 (C.D. Cal. Mar. 27, 2000) (trespass to chattels claim preempted

12 by Copyright Act where the "essence of each claim is the invasion and taking of factual

13 information compiled by Ticketmaster").  If on the other hand NetApp alleges (as NetApp appears

14 to do) that the information at issue is NetApp's property because it is "*considered* copyright

15 material," Second Am. Compl. ¶ 61 (emphasis added), NetApp cites no source of positive law that

16 grants a property right in material that is "considered" copyright protected.  Accordingly, NetApp's

17 allegation of trespass to chattels cannot be based on such a claim.

18    For the reasons stated above, the Court finds that NetApp's amended trespass to chattels

19 claim is deficient because NetApp fails to allege a source of positive law that gives NetApp a

20 property right over the information Reynolds is alleged to have taken.  Thus the Court GRANTS

21 Defendants' motion to dismiss NetApp's claim of trespass to chattels.[8]

22    As discussed in Section III.B.1.d, *supra*, when dismissing a complaint for failure to state a

23 claim, a district court may deny leave to amend due to "'repeated failure to cure deficiencies by

24 amendments previously allowed'" or "futility of amendment."  *Eminence Capital*, 316 F.3d at 1052

25 (internal citation omitted).  The Court has already dismissed NetApp's trespass to chattels claim

---

[8] Because the Court resolves the trespass to chattels claim on these grounds, the Court need not
address Defendants' alternate argument that the trespass to chattels claim should be dismissed
because NetApp inadequately pled damage.  *See* Mot. Dismiss at 12-13.

34

once before.  *See* Order at 28-30.  Although the Court granted NetApp leave to amend this claim,

NetApp has again failed to state a claim.  In addition, this is NetApp's third complaint, and NetApp

has had the opportunity to amend its trespass to chattels claim twice in response to motions to

dismiss.  *See* ECF Nos. 1, 34 & 71.  Yet, NetApp still fails to assert a viable claim.  The Court

therefore finds that NetApp has failed to cure the deficiencies in its trespass to chattels claim

despite two previous amendments, and that further amendment would be futile.  *See Eminence*

*Capital*, 316 F.3d at 1052 (district court may deny leave to amend due to "failure to cure

deficiencies by amendments previously allowed" or "futility of amendment") (internal quotation

marks omitted).  Accordingly, the Court dismisses NetApp's trespass to chattels claim with

prejudice.

**b.     Preemption of NetApp's Unfair Competition Claim Against Nimble**

The Court now turns to NetApp's claim of unfair competition against Nimble.  NetApp

alleges that Nimble engaged in unfair competition by: (a) recruiting "teams of NetApp employees

and resellers" to transport the "necessary infrastructure from NetApp . . . so that Nimble could

expand its sales market quicker and not have to invest substantial resources in developing its sales

and distribution channels"; (b) trading on NetApp's name by hiring former employees to "compete

unfairly in the marketplace and deceive consumers into thinking that Nimble is an innovator" and

produces products that are "just like NetApp but cheaper"; (c) "encouraging Nimble employees

who work with Reynolds to delete NetApp information after their departure"; (d) "encouraging

Reynolds and others to manipulate NetApp data . . . to give the false impression that NetApp's

competing products do not perform as well" as Nimble's; and (e) "encouraging employees who

work in its Australian sales office, including Reynolds, to use their knowledge of NetApp's

products to access a compilation of non-confidential copyright protected training and other

materials on NetApp's protected computers."  Second Am. Compl. ¶ 76.  With respect to NetApp's

allegation concerning the access of "non-confidential copyright protected training and other

materials," NetApp further alleges that it "invested substantial time and money preparing" these

materials, and that Nimble benefitted by "not having to . . . scour publicly available NetApp

35

information" for these same materials.  *Id*.  Defendants move to dismiss the unfair competition cause of action against Nimble in its entirety because it is preempted by CUTSA.  Mot. Dismiss at 14.

As previously discussed, NetApp's unfair competition cause of action is not preempted if it is based on a different nucleus of facts from a claim for the misappropriation of trade secrets, or proprietary or confidential information.  *K.C. Multimedia, Inc.*, 171 Cal. App. 4th at 954-58; *Convolve, Inc. v. Compaq Computer Corp.*, No. 00 CV 5141 (GBD), 2006 WL 839022, at *6 (S.D.N.Y. Mar. 31, 2006) (applying California law and finding that a claim is not preempted if it is based on "wrongdoing" that is "material[ly] distinct[ ] [from] the wrongdoing alleged in a [C]UTSA claim . . . .") (internal quotations omitted).  Conversely, if NetApp's cause of action is based on a claim of misappropriation, then it is preempted.  *K.C. Multimedia, Inc.*, 171 Cal. App. 4th at 954-58.

As a preliminary matter, the Court notes that although NetApp does not use the words "confidential," "proprietary," or "trade secret" in its unfair competition cause of action, at least some of the bases for NetApp's case of action appear to implicate the misappropriation of such material.  For instance, NetApp alleges that NetApp employees "transport[ed] *necessary infrastructure*" to Nimble so that "Nimble could expand its sales market quicker and not have to invest substantial resources in developing its sales and distribution channels." (emphasis added). Second Am. Compl. ¶ 76.  NetApp also alleges that Nimble "encourag[ed]" NetApp employees to "delete *NetApp information* before their departure in an attempt to further frustrate NetApp's ability to compete." (emphasis added).  Furthermore, NetApp alleges that Nimble "hir[ed] teams formerly employed by NetApp in Australia in order to compete unfairly in the marketplace."  *Id*.; *see also id.* (alleging that Nimble "targeted teams of NetApp employees and resellers to . . . transport necessary infrastructure from NetApp to Nimble").  Under California law, the solicitation of an employee to leave and associate with a competitor can implicate trade secret law if the solicitation involves the use of trade secrets.  *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1337 (9th Cir. 1980); *see also ReadyLink*, 126 Cal. App. 4th at 1019 (noting that

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION TO STRIKE

1     although "mere solicitation" of an employee to "leave and associate with a competing firm is not

2     illegal," it likely violated CUTSA where soliciting party used "misappropriated trade secret

3     information to solicit ReadyLink's employees").  Finally, NetApp states that Nimble committed

4     unfair business practices by encouraging NetApp employees to "access a compilation of . . .

5     NetApp training and other materials"  which are otherwise "publicly available" but in which

6     "NetApp has invested substantial time and money preparing."  Second Am. Compl. ¶ 76.  As

7     previously discussed, under California law compilations of otherwise publicly-available

8     information or data may receive trade secret protection if there is, *inter alia*, evidence that the

9     compiling party procured the compilation by expending substantial resources.  *See ReadyLink*, 126

10    Cal. App. 4th at 1020 (publicly available information regarding plaintiff's lists of hospitals and

11    nurses may receive trade secret protection because there was "substantial evidence establishing that

12    ReadyLink's lists of hospitals and nurses . . . were procured by substantial time, effort, and

13    expense.").  To the extent that any of the bases for NetApp's unfair competition cause of action

14    implicate the misappropriation of trade secrets, or confidential or proprietary information,

15    NetApp's cause of action would be subject to CUTSA preemption.  *K.C. Multimedia, Inc.*, 171 Cal.

16    App. 4th at 954-58.

17              In addition, at least one of the bases for NetApp's unfair competition cause of action may

18    also implicate the Copyright Act, and therefore be subject to preemption under that law. [9]  NetApp

19    alleges that Nimble engaged in unfair competition by, *inter alia*, "encouraging its employees who

20    work in its Australian sales office, including Reynolds," to access NetApp's "compilation of non-

21    confidential *copyright protected* NetApp training and other materials."  Second Am. Compl. ¶ 76

22    (emphasis added).  To the extent that NetApp alleges that Nimble violated unfair competition law

23    by infringing NetApp's copyright, such a claim would be subject to preemption under the

24    Copyright Act.  *See Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (claim of

25    _____

26    [9] Defendants raised the argument regarding copyright preemption for the first time in Defendants'
      reply brief.  Reply Mot. Dismiss at 14.  Normally, arguments raised for the first time in a reply
      brief are waived.  *Nevada v. Watkins*, 914 F.2d 1545, 1560 (9th Cir. 1990).  However, the Court

27    may *sua sponte* dismiss a claim if it is clear that the plaintiff cannot possibly win relief.  *Sparling v.
      Hoffman Const. Co.*, 864 F.2d 635, 637-38 (9th Cir. 1988).

28
                                                    37

unfair competition under California law preempted by Copyright Act if (1) the rights at issue are equivalent to those protected by the Copyright Act and (2) the work involved falls within the subject matter of the Copyright Act).

In sum, there is a possibility that at least some of the bases for NetApp's claim of unfair competition against Nimble are preempted by CUTSA or the Copyright Act.  To the extent that this is the case, Defendants' motion to dismiss is GRANTED without leave to amend.  However, due to NetApp's vague pleading, the Court cannot conclusively determine that NetApp's unfair competition cause of action is in fact so preempted.  Indeed, construing the pleadings in the light most favorable to the plaintiff—as the Court must in ruling on a Rule 12(b)(6) motion, *see Manzarek*, 519 F.3d at 1031—it is plausible to read NetApp's unfair competition cause of action to assert a claim that is based on the use of non-confidential, non-trade secret, and non-proprietary information.  Similarly, it is possible to read NetApp's cause of action in such a way that does not implicate copyright infringement.  Therefore, the Court DENIES the Defendants' motion to dismiss to the extent that NetApp's unfair competition cause of action does not implicate the misappropriation of trade secrets or confidential or proprietary information, or does not raise a claim for copyright infringement.

### c.    Supplemental Jurisdiction Over NetApp's Unfair Competition Claim Against Nimble

The Court now turns to the question of whether it should exercise supplemental jurisdiction over NetApp's state law claim of unfair competition against Nimble.[10]  To answer this question, the Court must refer to the history of this case.  NetApp's unfair competition cause of action

---

[10] Although neither party raised the issue of supplemental jurisdiction in their briefs, at the January 28, 2015 case management conference Defendants suggested that the Court could dismiss Nimble as a defendant in this lawsuit for lack of supplemental jurisdiction, and NetApp had an opportunity to respond.  Moreover, under 28 U.S.C. § 1367, district courts may *sua sponte* decline to exercise supplemental jurisdiction over a state law claim if: (1) the claim raises a novel or complex issue of state law; (2) the state law claim substantially predominates over the federal claims; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) if there is some other exceptional and compelling reason to decline jurisdiction.  28 U.S.C. § 1367(c); *Pickern v. Autozone W., Inc*., No. 2:13-CV-00321-JAM-EF, 2014 WL 4661152, at *1 (E.D. Cal. Sept. 17, 2014) (citing *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997)).  In deciding whether to exercise supplemental jurisdiction, the court should consider the interests of judicial economy, convenience, fairness, and comity.  *Smith v. Lenches*, 263 F.3d 972, 977 (9th Cir. 2001).

38

against Nimble in its First Amended Complaint was based (1) on Nimble's "unlawful" conduct with regards to the CFAA, First Am. Compl. ¶ 167, and (2) on Nimble's "unfair business practices" regarding NetApp's former employees and confidential information, *id.* ¶¶ 168-69.  The Court's May 12, 2014 Order on Defendants' motion to dismiss the First Amended Complaint dismissed with leave to amend NetApp's unfair competition cause of action against Nimble based on Nimble's alleged unlawful conduct with regards to the CFAA, but declined supplemental jurisdiction over NetApp's unfair competition cause of action against Nimble for Nimble's alleged unfair business practices regarding NetApp's former employees.  Order at 28.  The Court did not grant NetApp leave to amend NetApp's unfair competition cause of action based on unfair business practices regarding NetApp's former employees.  *Id.*  The Court also declined supplemental jurisdiction over all of NetApp's state law claims against NetApp's former employees, because such claims were exclusively the province of state law and bore little factual relation to the CFAA allegations.  *Id.* at 26-27.  Moreover, the factors of economy, convenience, fairness, and comity further supported a declination of supplemental jurisdiction.  *Id.* at 27.  NetApp already had and continues to have a pending lawsuit in state court against its former employees for unfair competition and breach of contract, and against Nimble for trade secret misappropriation.  At the January 28, 2015 case management conference, the parties represented that the Superior Court granted demurrer without leave to amend as to NetApp's unfair competition claim against Nimble, which the Superior Court found was preempted by CUTSA, and as to NetApp's intentional interference with contract claim against Nimble and a former NetApp employee.

The Court finds that these same reasons for declining supplemental jurisdiction over NetApp's unfair competition cause of action against Nimble based on Nimble's alleged unfair business practices regarding NetApp's former employees remain true today.  In fact, these reasons are even stronger.  All CFAA causes of action against Nimble have been dismissed with prejudice in this Order, and therefore there is no surviving federal cause of action against Nimble.  *See* Sections III.B.1 & 2, *supra*.  Moreover, the Court never granted NetApp leave to amend its unfair competition causes of action against Nimble based on Nimble's alleged unfair business practices

39

1    regarding NetApp's former employees.  *See* Order at 25-27.  Thus, the Court hereby declines

2    supplemental jurisdiction over NetApp's unfair competition cause of action against Nimble to the

3    extent that it is based on the conduct of Nimble with relation to NetApp's former employees.

4    Specifically, the Court declines to exercise jurisdiction over allegations that Nimble: (a) recruited

5    "teams of NetApp employees"[11] to transport the "necessary infrastructure from NetApp . . . so that

6    Nimble could expand its sales market quicker and not have to invest substantial resources in

7    developing its sales and distribution channels"; (b) traded on NetApp's name by hiring former

8    employees to "compete unfairly in the marketplace and deceive consumers into thinking that

9    Nimble is an innovator" and produces products that are "just like NetApp but cheaper"; and (c)

10   encouraged "Nimble employees who work with Reynolds to delete NetApp information after their

11   departure."  Second Am. Compl. ¶ 76.  This Court is well within its discretion to decline

12   supplemental jurisdiction over this portion of NetApp's claim.  *See United Mine Workers v. Gibbs*,

13   383 U.S. 715, 726 (1966) ("It has consistently been recognized that pendent jurisdiction is a

14   doctrine of discretion, not of plaintiff's right.")

15        However, the Court will exercise supplemental jurisdiction over NetApp's unfair

16   competition cause of action against Nimble to the extent that NetApp's allegations form part of the

17   same case or controversy as NetApp's CFAA claims against Reynolds and to the extent that these

18   allegations are not preempted by CUTSA or the Copyright Act.  *See* 28 U.S.C. § 1367(a) (federal

19   court may exercise supplemental jurisdiction over state-law claims that are "so related to claims in

20   the action within [the court's] original jurisdiction that they form part of the same case or

21   controversy.").  Here, NetApp alleges that Reynolds violated 18 U.S.C. §§ 1030(a)(2)(C) and

22   (a)(4) of the CFAA.  Second Am. Compl. ¶¶ 50-58.  This Court has original jurisdiction over this

23   federal statutory cause of action.  NetApp further alleges that Nimble violated state unfair

24   competition laws by, among other things, encouraging Reynolds to engage in conduct that violated

25   the CFAA.  *See* Second Am. Compl. ¶ 76.  Accordingly, the Court will exercise supplemental

26   _____

27   [11] However, the Court will exercise supplemental jurisdiction over NetApp's claim of unfair
     competition against Nimble to the extent the claim involves Nimble's interactions with NetApp
     "resellers."  *See* Second. Am. Compl. ¶ 76.  This is because resellers are not NetApp's former
28   employees.

40

1    jurisdiction over NetApp's unfair competition cause of action to the extent it forms part of the same

2    case or controversy as NetApp's CFAA claim against Reynolds, does not involve former NetApp

3    employees, and is not preempted by CUTSA or the Copyright Act.  Specifically, the Court will

4    exercise supplemental jurisdiction over NetApp's unfair competition cause of action to the extent it

5    is not preempted and it is based on the allegation that Nimble (a) recruited NetApp "resellers" to

6    transport the "necessary infrastructure from NetApp . . . so that Nimble could expand its sales

7    market quicker and not have to invest substantial resources in developing its sales and distribution

8    channels"; (d) encouraged "Reynolds and others to manipulate NetApp data . . . to give the false

9    impression that NetApp's competing products do not perform as well" as Nimble's; and (e)

10   encouraged "employees who work in its Australian sales office, including Reynolds, to use their

11   knowledge of NetApp's products to access a compilation of . . . other materials on NetApp's

12   protected computers."[12]  Second Am. Compl. ¶ 76.  Moreover, the factors of economy,

13   convenience, and fairness support the exercise of supplemental jurisdiction because the Court has

14   original jurisdiction over NetApp's CFAA cause of action against Reynolds, and Reynolds is not a

15   defendant in the state court action.

16          The Court otherwise declines to exercise supplemental jurisdiction over, and dismisses with

17   prejudice, NetApp's claim of unfair business practices against Nimble.

18                    **d.     Preemption of NetApp's Unfair Competition Claim Against Reynolds**

19          Finally, the Court examines NetApp's claim of unfair competition against Reynolds.

20   NetApp alleges that Reynolds engaged in unfair competition by: (a) "manipulating NetApp's

21   copyright protected data . . . to give the false impression that NetApp's competing products do not

22   perform as well as Nimble's"; (b) accessing a "compilation of non-confidential copyright protected

23   NetApp materials," in which NetApp invested "substantial time and money preparing" and from

24   which Reynolds benefitted by not having to "scour publicly available NetApp information"; (c)

25   engaging in the "unauthorized use, reproduction, and distribution of NetApp's copyright protected

---

[12] The Court declines to exercise supplemental jurisdiction over the following vague unfair
competition allegations as to former NetApp employees: (1) that Nimble encouraged "employees
who work in its Australian sales office" to access training and other materials; and (2) that Nimble
encouraged Reynolds "and others" to manipulate NetApp's data.  Second Am. Compl. ¶ 76.

41

United States District Court
For the Northern District of California

1  Synergy software," which Reynolds allegedly used to access NetApp's protected computers; and

2  (d) "accessing NetApp's protected databases and continuing to take NetApp training course after

3  [Reynolds] knew he was going to work for Nimble." Second Am. Compl. ¶ 77. Defendants move

4  to dismiss all these claims based on CUTSA preemption. Mot. Dismiss at 14-15.

5       As an initial matter, the Court notes that one of NetApp's allegations against Reynolds

6  clearly runs afoul of copyright preemption. A claim of unfair competition may be preempted by

7  the Copyright Act where two elements are met: (1) the "rights that a plaintiff asserts" under state

8  unfair competition law "are equivalent to those protected by the Copyright Act"; and (2) the "work

9  involved . . . fall[s] within the subject matter of the Copyright Act." *Kodadek*, 152 F.3d at 1212.

10  Here, NetApp's cause of action for unfair competition against Reynolds alleges that Reynolds

11  engaged in, *inter alia*, the "unauthorized use, reproduction, and/or distribution of NetApp's

12  copyright protected Synergy software." Second Am. Compl. ¶ 77. The rights that NetApp seeks to

13  protect—the right to protect against the unauthorized use, reproduction, and distribution of

14  copyrighted material—are equivalent to the rights protected by the Copyright Act. *See* 17 U.S.C. §

15  106 (protecting copyright owner's right to, among other things, reproduce and distribute

16  copyrighted works). Moreover, the work at issue here—software—is within the subject matter of

17  the Copyright Act. *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 599 (9th Cir.

18  2000) (software programs may receive copyright protection). Therefore, the Copyright Act

19  preempts NetApp's claim that Reynolds engaged in unfair competition through the "unauthorized

20  use, reproduction, and/or distribution of NetApp's copyright protected Synergy software." Second

21  Am. Compl. ¶ 77.

22       Furthermore, another two of the bases for NetApp's unfair competition cause of action may

23  also be preempted by the Copyright Act: (1) the allegation that Reynolds manipulated "NetApp's

24  copyright protected data," and (2) the allegation that Reynolds accessed "a compilation of non-

25  confidential copyright protected NetApp training and other materials." *Id*. As the Court found

26  with NetApp's unfair competition cause of action against Nimble, to the extent that NetApp alleges

27

28

42

**United States District Court**
For the Northern District of California

1    Reynolds violated unfair competition law by infringing NetApp's copyright, such a claim would be

2    preempted by the Copyright Act.  *See Kodadek*, 152 F.3d at 1212.

3            Moreover, at least some of the bases for NetApp's unfair competition cause of action

4    against Reynolds may also be preempted by CUTSA.  For instance, NetApp alleges that Reynolds

5    manipulated NetApp's "data" to make NetApp's products appear inferior to Nimble's, and that

6    Reynolds accessed "NetApp's protected databases" to take "NetApp training courses."  Second

7    Am. Compl. ¶ 77.  NetApp also alleges that Reynolds accessed a compilation of "publicly

8    available" material in which NetApp invested "substantial time and money preparing," a claim

9    which may implicate state trade secret law and therefore be preempted by CUTSA.  *See Primetech*

10   *Corp.*, 2008 WL 1899976, at *4 (California trade secret protection may include a compilation of

11   publicly available information).  To the extent that any of the bases for NetApp's unfair

12   competition cause of action against Reynolds involve the misappropriation of confidential or

13   proprietary information, NetApp's claim would be preempted by CUTSA.  *K.C. Multimedia, Inc.*,

14   171 Cal. App. 4th at 954-58.

15           In sum, one of the bases for NetApp's unfair competition claim against Reynolds is

16   certainly preempted by the Copyright Act, and there is a possibility that the rest of the other bases

17   are also preempted by either the Copyright Act or by CUTSA.  To the extent that this is the case,

18   Defendants' motion to dismiss is GRANTED without leave to amend.  However, again, due to

19   NetApp's vague pleading, the Court cannot conclusively determine whether the entirety of

20   NetApp's unfair competition cause of action against Reynolds is in fact preempted.  Construing the

21   pleadings in the light most favorable to the plaintiff—as the Court must do here, *see Manzarek*, 519

22   F.3d at 1031—it is plausible to read at least some of the bases for NetApp's unfair competition

23   cause of action to assert a claim that is based on the use of non-confidential, non-trade secret, and

24   non-proprietary information.  Similarly, although one of NetApp's bases for its cause of action is

25   certainly preempted by the Copyright Act, it is possible to read the remaining bases in such a way

26   that does not implicate copyright infringement.  Therefore, the Court DENIES the Defendants'

27   motion to dismiss to the extent that NetApp's unfair competition cause of action does not implicate

28

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

1    either the misappropriation of trade secrets or confidential or proprietary information, or a claim

2    for copyright infringement.

3    **C.    Defendants' Motion to Strike**

4          The Court now addresses Defendants' motion to strike.  As detailed in Section II.B, *supra*,

5    Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient

6    defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Proc. 12(f).

7    Matter is "immaterial" if it "has no essential or important relationship to the claim for relief or the

8    defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *reversed

9    on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).  Matter is "impertinent" if it

10   "consists of statements that do not pertain, and are not necessary, to the issues in question." *Id.*  "If

11   there is any doubt whether the portion to be stricken might bear on an issue in the litigation, the

12   court should deny the motion." *Platte Anchor Bolt, Inc.*, 352 F. Supp. 2d at 1057.  "Matter will not

13   be stricken from a pleading unless it is clear that it can have no possible bearing upon the subject

14   matter of the litigation; if there is any doubt as to whether under any contingency the matter may

15   raise an issue, the motion may be denied . . . ." *Holmes v. Elec. Document Processing, Inc.*, 966 F.

16   Supp. 2d 925, 938 (N.D. Cal. 2013) (quoting *Wailua Assocs. v. Aetna Casualty and Surety Co.*, 183

17   F.R.D. 550, 553-54 (D. Haw. 1998)).  While a Rule 12(f) motion provides the means to excise

18   improper materials from pleadings, such motions are generally disfavored because the motions

19   may be used as delaying tactics and because of the strong policy favoring resolution on the merits.

20   *McRee v. Goldman*, No. 11-CV-00991-LHK, 2012 WL 929825, at *5 (N.D. Cal. Mar. 19, 2012).

21   To that end, courts have held that a motion to strike matter from a complaint simply for being

22   redundant, immaterial, impertinent, or scandalous "should only be granted if 'the matter has no

23   logical connection to the controversy at issue and may prejudice one or more of the parties to the

24   suit.'" *N.Y. City Emps. Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009) (Ware, J.)

25   (quoting *Rivers v. Cnty. of Marin*, No. C 05–4251, 2006 WL 581096, at *2 (N.D. Cal. 2007)

26   (Illston, J.)).  Prejudice in the context of a motion to strike occurs where "issues will be

27

28

**United States District Court**
For the Northern District of California

44

1  unnecessarily complicated or . . . superfluous pleadings will cause the trier of fact to draw

2  unwarranted inferences at trial." *Alco Pac., Inc.*, 217 F. Supp. 2d at 1033.

3      Here, Defendants move to strike a portion of NetApp's fourth cause of action for unfair

4  competition, as well as four paragraphs of the factual allegations section of NetApp's Second

5  Amended Complaint.  The Court will discuss each one in turn.

### 1.    Motion to Strike Fourth Cause of Action

7      Defendants move to strike the following portion of NetApp's fourth cause of action, which

8  details specific conduct of Nimble, or in the alternative Nimble AUS, that NetApp alleges

9  constitute unfair competition.  The portion that Defendants move to strike alleges Nimble or

10  Nimble AUS engaged in, among other conduct:

> (a) targeting teams of NetApp employees and resellers to open an Australian sales office and to transport necessary infrastructure from NetApp to Nimble in violation of their contractual obligation to NetApp so that Nimble could expand its sales market quicker and not have to invest substantial resources in developing its sales and distribution channels; (b) trading on NetApp's name by hiring teams formerly employed by NetApp in Australia in order to compete unfairly in the marketplace and deceive consumers into thinking that Nimble is an innovator and can provide products that are "just like NetApp but cheaper;" (c) encouraging Nimble employees who work with Reynolds to delete NetApp information before their departure in an attempt to further frustrate NetApp's ability to compete . . . .

Second Am. Compl. ¶ 76.  NetApp argues that this paragraph is immaterial because it refers only to

state law claims that this Court previously dismissed for lack of supplemental jurisdiction.  Reply

Mot. Strike at 2.  The Court agrees.  As discussed in Section III.B.3.c, *supra*, the Court declines to

exercise supplemental jurisdiction over NetApp's unfair business practices cause of action against

Nimble with respect to Nimble's alleged conduct involving former NetApp employees.  Therefore,

these allegations are irrelevant and are appropriate subjects of a motion to strike.  *Fantasy, Inc.*,

984 F.2d at 1527.  Moreover, because these allegations are irrelevant, allowing a jury to hear them

would "unnecessarily complicate[]" trial or "cause the trier of fact to draw unwarranted

inferences."  *Alco Pac., Inc.*, 217 F. Supp. 2d at 1033 (motion to strike properly granted where

material to be struck would unnecessarily complicate trial, and cause the trier of fact to draw

"unwarranted inferences").  Accordingly Defendants' motion to strike Paragraph 76 is GRANTED.

45

2.      **Motion to Strike Additional Factual Allegations**

Defendants also move to strike four factual allegations in the Second Amended Complaint.

First, Defendants move to strike the following portion of Paragraph 27 of the Second Amended

Complaint:

> For example, Daniel Weber ("Weber"), a former NetApp Senior Systems Engineer,
> Timothy Binning ("Binning"), a former NetApp Enterprise Account Manager, and
> Sandhya Klute ("Klute") a former NetApp Senior Engineering Program Manager
> are all alleged to have taken NetApp's proprietary and/or confidential information in
> violation of their respective employment agreements with NetApp shortly before
> departing for Nimble.  Weber, Binning, and Klute are currently defendants in a state
> court action pending in Santa Clara County Superior Court. *See NetApp, Inc. v.*
> *Nimble et al.*, Case No.1:14-cv-265454, Santa Clara County Superior Court (the
> 'State Action').

Second Am. Compl. ¶ 27.  Second, Defendants move to strike in its entirety Paragraph 28, which

reads:

> Moreover, upon information and belief, Nimble further attempted to inhibit the
> growth and progress of NetApp by encouraging those departing from NetApp to
> Nimble to delete, and/or make otherwise unrecoverable, inaccessible, or unavailable
> NetApp's confidential and proprietary information to deprive NetApp of its
> employee work product. Neil Glick ("Glick"), a former NetApp Technical
> Marketing Engineer, and Christopher Alduino ("Alduino"), a former NetApp SAN
> Interoperability Engineer are alleged to have done just that and are similarly
> defendants in the pending State Action. Nimble is the employer of each of the
> individual defendants named in the State Action and is itself a defendant thereto.

*Id.* ¶ 28.

Both Paragraphs 27 and 28 describe allegations related to the misappropriation of

confidential and proprietary information by former NetApp employees.  Paragraph 27 details the

allegation that former NetApp employees took "NetApp's proprietary and/or confidential

information . . . shortly before departing for Nimble," i*d.* ¶ 27, and therefore details a claim of

misappropriation.  Paragraph 28 alleges that former NetApp employees deleted "NetApp's

confidential and proprietary information" and rendered such information "unrecoverable,

inaccessible, or unavailable."[13]  *Id.* ¶ 28.  An allegation that former employees, *inter alia*, deleted

---

[13] According to NetApp's First Amended Complaint, these NetApp employees rendered NetApp's
confidential and proprietary information unrecoverable or inaccessible after they allegedly took
copies of such information with them to Nimble.  ECF No. 34, ¶¶ 80, 82.

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION
TO STRIKE

United States District Court
For the Northern District of California

1   confidential or proprietary information from their former employer's system may support a claim

2   of trade secret misappropriation.  *See United Ribbon Co.*, 2002 WL 922940, at *4 (finding

3   misappropriation where former employees allegedly copied and tried to permanently delete "more

4   than 2,000 pages of information from United's computer systems.")  As already discussed, to the

5   extent that NetApp tries to base its claims in the instant lawsuit on the taking of trade secrets or

6   confidential or proprietary information, NetApp's claim would be preempted by CUTSA.  *See*

7   *SunPower*, 2012 WL 6160472, at *12-13.  Furthermore, all five individuals named in Paragraphs

8   27 and 28 were part of NetApp's state law claims that this Court previously dismissed for lack of

9   supplemental jurisdiction.  *See* Order at 25-27 (declining to exercise supplemental jurisdiction over

10   NetApp's claims against Weber, Klute, Glick, Binning, and Alduino).  Therefore, these allegations

11   are irrelevant and allowing a jury to hear these claims would unnecessarily complicate trial or

12   cause the jury to draw unwarranted inferences.  *See Fantasy, Inc.*, 984 F.2d at 1527; *Alco Pac.,*

13   *Inc.*, 217 F. Supp. 2d at 1033.  Accordingly, Defendants' motion to strike Paragraphs 27 and 28 is

14   GRANTED.

15         Third, Defendants move to strike Paragraph 29 of the Second Amended Complaint.  That

16   paragraph reads:

17         According to *Forbes* magazine, when Vasudevan came to Nimble in January 2011,
      Nimble had 40 employees. Within a year of his arrival, Nimble experienced massive

18         growth to 230 employees. Currently, approximately 15% of Nimble's total
      workforce is made up of former NetApp employees, including half of its executive

19         staff. Between July 2012 to July 2013 alone, Nimble hired approximately 55
      NetApp employees, with a focus on those who had technical and sales roles at

20         NetApp – persons who had access to NetApp's technical and sales documents that
      could help Nimble quickly develop a competing product to unfairly compete with

21         NetApp.

22

23   Second Am. Compl. ¶ 29.  Much of Paragraph 29 details allegations that former NetApp

24   employees left NetApp to join Nimble.  As discussed in Section III.B.3.c, *supra*, the Court declines

25   to exercise supplemental jurisdiction over NetApp's allegations related to Nimble's alleged unfair

26   business practices regarding NetApp's former employees.  Therefore, much of Paragraph 29

27   pertains only to a subject matter over which this Court declines jurisdiction.  Furthermore, the

28   remainder of Paragraph 29—specifically the phrase at the end that NetApp targeted "persons who

47

had access to NetApp's technical and sales documents that could help Nimble quickly develop a competing product to unfairly compete with NetApp"—relates to a claim for misappropriation of confidential or proprietary information.  As already discussed, such a claim would be preempted by CUTSA.  *See SunPower*, 2012 WL 6160472, at *12-13.  Accordingly, Paragraph 29 contains allegations that are irrelevant to this lawsuit, and could unnecessarily complicate trial or cause the trier of fact to draw unwarranted inferences.  *See Fantasy, Inc.*, 984 F.2d at 1527; *Alco Pac., Inc.*, 217 F. Supp. 2d at 1033.  Thus Defendants' motion to strike Paragraph 29 is GRANTED.

Finally, Defendants move to strike Paragraph 30 in its entirety, which reads:

> Upon information and belief, Nimble regularly trades on NetApp's name by telling customers and/or prospective customers that Nimble has acquired technology teams from NetApp, many of which were employed by NetApp for a long time, implying that Nimble's products provide quality and functionality synonymous with NetApp.

Second Am. Compl. ¶ 30.  Based on its plain language, Paragraph 30 supports NetApp's unfair competition cause of action against Nimble in which NetApp alleges that Nimble "trad[es] on NetApp's name by hiring teams formerly employed by NetApp" and "deceiv[ing] consumers into thinking that Nimble . . . can provide products that are 'just like NetApp but cheaper.'"  *Id.* ¶ 76.  As discussed in Section III.B.3.c, *supra*, the Court previously declined and continues to decline to exercise supplemental jurisdiction over NetApp's unfair competition cause of action against Nimble based on Nimble's unfair business practices regarding NetApp's former employees.  Yet, this is precisely the subject matter of Paragraph 30.  Therefore, Paragraph 30 is immaterial to this litigation, and its inclusion in NetApp's complaint would only serve to unnecessarily complicate trial or cause the jury to draw unwarranted inferences.  *See Fantasy, Inc.*, 984 F.2d at 1527; *Alco Pac., Inc.*, 217 F. Supp. 2d at 1033.  Defendants' motion to strike Paragraph 30 is accordingly GRANTED.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART as follows:

United States District Court
For the Northern District of California

- Defendants' motion to dismiss NetApp's allegation that Nimble is vicariously liable for trespass to chattels and violation of the CFAA is GRANTED without leave to amend;

- Defendants' motion to dismiss NetApp's claim under 18 U.S.C. § 1030(a)(5) against Nimble and Reynolds is GRANTED without leave to amend;

- Defendants' motion to dismiss NetApp's trespass to chattels claim against Nimble and Reynolds is GRANTED without leave to amend;

- Defendants' motion to dismiss NetApp's unfair competition claim against Nimble is GRANTED without leave to amend to the extent it is preempted by CUTSA or the Copyright Act, and is otherwise DENIED.  Moreover, as discussed in Section III.B.3.c, *supra*, and consistent with the Court's May 14, 2014 Order, the Court declines to exercise supplemental jurisdiction over NetApp's unfair competition claim against Nimble based on Nimble's alleged unfair business practices regarding NetApp's former employees.

- Defendants' motion to dismiss NetApp's unfair competition claim against Reynolds is GRANTED without leave to amend to the extent it is preempted by CUTSA or the Copyright Act, and is otherwise DENIED.

In addition, Defendants' motion to strike is GRANTED.

**IT IS SO ORDERED.**

Dated: January 29, 2015                                    _____

LUCY H. KOH
United States District Judge

Case No.: 5:13-CV-05058-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS, AND GRANTING MOTION TO STRIKE